Russell D. WIDDER, Plaintiff,

v.

NEW YORK, CHICAGO AND ST. LOUIS RAILROAD COMPANY, a corporation, Defendant.

Civ. A. No. 295.

United States District Court
W. D. Pennsylvania.

Dec. 27, 1955.

See also, 235 F.2d 752.

James P. McArdle, Pittsburgh, Pa., for plaintiff.

Quinn, Leemhuis, Plate & Dwyer, Frank G. Quinn, Erie, Pa., for defendant.

WILLSON, District Judge.

This Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., case was tried at the spring 1955 Civil Jury Term at Erie. At the conclusion of a four-day trial, a special verdict was submitted to the jury. The jury found defendant negligent and exonerated plaintiff on the issue of contributory negligence. Damages were assessed by the jury at $75,500, and pursuant to the verdict, judgment was entered for plaintiff. At the close of the evidence, defendant moved for a directed

verdict. It now has pending two motions, one for judgment notwithstanding the verdict and the other in the alternative for a new trial.

First: Motion for Judgment n. o. v.

■■■ This motion raises a question of law only. See Marsh v. Illinois Cent. R. Co., 5, Cir., 175 F.2d 498. The motion is filed under Rule 50, 28 U.S.C.A., and the question is whether there is any evidence which, if believed, would authorize a verdict against movant. The trial judge in considering those motions does not exercise discretion, but makes a ruling of law, and if he errs the appellate courts may reverse.

The evidence in this case on the issue of liability largely relates to plaintiff's contention that the defendant was negligent in the maintenance of its yard at Brewster, Ohio. Plaintiff introduced evidence showing: that on April 20, 1953, the night he was hurt, he was thirty-five years of age. He was an experienced brakeman, working in the switching yards of the defendant at Brewster. He had been in good physical condition. At about 7:45 P. M., railroad time, as night was approaching and in the early darkness, but with electric lights turned on, plaintiff was riding on the footboard on the front end of a switching engine. The engine was moving at a speed of between five and ten miles per hour. However, the engine was moving in reverse, so that plaintiff was looking to the rear of the engine, but in the direction in which he was riding. As the engine arrived at a point opposite a switchman's shanty, plaintiff stepped off the footboard to line up a switch, and in doing so his right foot, in touching the ground, came in contact with a soft spot. He said that his right foot went out from under him and he hit the ground, landing on his buttocks, very close to the end, but not touching either the rail or any of the ties.

Considerable testimony was directed to a description of the area in which plaintiff received his injury. The spot on the ground was described variously as soggy, wet, soft, a spot of mud and water, a hump, and a spot generally muddy. Plaintiff and his witnesses testified as to the general condition of the ground in and about the ties and along the tracks in the walking areas in the Brewster Yard. There was testimony on the part of the plaintiff that it had been raining for approximately a week before the accident but there was some uncertainty as to whether it had rained that day or evening. There was evidence on the part of the plaintiff that in the wet seasons of the year especially, engines and cars passing over the rails on the Brewster Yard tracks, pumped up water and mud from underneath the ties so that generally, in the spring of the year at least, the walking areas which the switchmen were required to use in getting off and on engines and cars were in an unsafe condition, because wet and muddy and at various times slushy and thus slippery and hazardous. Evidence was also introduced that there was no drainage system whatsoever in the Brewster Yard. Also, there was evidence on the part of the plaintiff that the only ballast used was cinders and ashes which came from the locomotives, and that a good or better grade of ballast was available nearby.

■■■ The foregoing is a brief summary of evidence on the part of plaintiff to establish negligence of defendant. As plaintiff had the verdict of the jury, he is entitled to have the evidence read in the light most advantageous to him, all conflicts therein being resolved in his favor and he must be given the benefit of every fact and inference which may reasonably be deduced from the evidence. See Baltimore & O. R. Co. v. Muldoon, 3 Cir., 102 F.2d 151. On the issue of negligence then, there was ample evidence to support the verdict. It will not be disturbed on that ground.

On the issue of damages it appears to be the position of defendant on the motion for judgment n. o. v. as well as for a new trial, that the testimony presented by the plaintiff through his medical experts on the trial of this case is so conflicting that the jury's findings of per-

manent injury and loss of future employability could only be a mere guess, and therefore the jury's verdict is excessive in the amount of allowance for these items.

Defendant cites decisions of the Federal courts which it says clearly establish that when the burden of proof is on the party to a litigation he must do more than produce evidence that creates only a doubt. Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, and Thomas Roberts & Co. v. Calmar S. S. Corp., D.C.Pa.1945, 59 F.Supp. 203. Defendant also says that where two equally justifiable inferences may be drawn from the facts proven, one for and the other against the plaintiff, neither is proven and the verdict of the jury must be against the plaintiff, who has the burden of proof. Texas Co. v. Hood, 5 Cir., 161 F.2d 618, certiorari denied 332 U.S. 829, 68 S.Ct. 206, 92 L.Ed. 403, and Morrison v. Le Tourneau Co. of Georgia, 5 Cir., 138 F.2d 339.

An examination of the evidence on damages viewed in the light most favorable to the plaintiff establishes the following: Plaintiff, although realizing that he had been hurt, arose unassisted, discontinued his work and rested in the switchman's shanty. He then finished the shift and went home at about 11:40 the same evening. Plaintiff worked three days after the accident before consulting a doctor or reporting the injury. On the fourth day, plaintiff called upon the company physician, Dr. Hanna, in Brewster. He complained of his back, hips, neck and ankle. The doctor bandaged and taped the plaintiff, prescribed sedatives and advised him to return in a week's time. This treatment did ease the pain to some extent. The plaintiff returned to the doctor, who prescribed more sedatives and advised him to try working for one week. The plaintiff worked from the 5th of May through the 10th, but he then had to quit work because of the pain in his back. Dr. Hanna was advised of this situation and at that time he notified the plaintiff that the X-rays previously taken were negative. On approximately the 25th of May the plaintiff, under the doctor's instructions, returned to work for a six-day period, but his condition was such that he was unable to continue work any longer. At this point he was sent to a Dr. Houk in Cleveland, Ohio by Dr. Hanna, where he received an examination and was sent home.

The plaintiff's attorney sent him to Dr. Philip A. Faix, where he was examined on June 17, 1953 in the doctor's office in Pittsburgh. The plaintiff complained to Dr. Faix of pain running down his left leg and into his foot. The doctor found as an objective symptom a parivertebral spasm in the low back indicating an underlying pathology, and a minor compression fracture to the body of vertebra L 1, which in his opinion was evident in the X-rays taken on that date. The doctor also found definite evidence of diminution of reflexes, particularly in the left leg and ankle. The diagnosis of the doctor, based on these symptoms, was that the plaintiff had a protruded vertebral disc. On January 17, 1954, plaintiff was advised by Dr. Faix that an operation would relieve the difficulty in his lower back.

The plaintiff was admitted to Mercy Hospital in Pittsburgh on February 3, 1954. At that time, Dr. Faix brought in Dr. Floyd Bragdon, a neurosurgeon, as consultant in the case. The continued observations of both doctors indicated disc trouble in the lower back, with possible instability of the spine due to ligamentous damage. On February 12, 1954, Dr. Bragdon operated upon the plaintiff, removing two damaged discs. During the course of the operation it was the opinion of both Dr. Bragdon and Dr. Faix that there was no spinal instability, and Dr. Bragdon found no evidence of root compression. The patient's postoperative convalescence was satisfactory, and on March 4, 1954 he was discharged from the hospital. In the opinion of both doctors the plaintiff had good results from the removal of the discs as far as the pain in his back was concerned. Dr.

Faix stated that in his opinion all but fifteen to twenty per cent of the discomfort brought about by the original injury was removed by the operation. Thereafter the plaintiff was examined approximately once a month by both doctors in their respective offices. On May 18, 1954, about three months after the operation, the plaintiff complained to Dr. Bragdon of a recurrence of pain in his back. On his visit to Dr. Bragdon on June 11, 1954, the plaintiff advised him that he experienced a numbness in his feet after walking four to five blocks. The doctor thought it better for the plaintiff not to return to work but recommended convalescence for one to two more months, although he did not testify with regard to any permanent disability. On August 9, 1954, the plaintiff again complained of the numbness in his feet to Dr. Bragdon, who found a vague diminution of pinprick over the left calf on the outer side. Dr. Bragdon's December 3rd examination of the plaintiff disclosed the plaintiff's complaint of lost strength and coordination in his legs after walking. Dr. Faix had by this time put wedges in the plaintiff's left shoe as the result of a definite pelvic tilt. Dr. Bragdon then returned the patient to Dr. Faix for whatever treatment he deemed necessary. On March 19, 1955, Dr. Bragdon again examined the plaintiff, who complained to him of a tingling and numbness in his feet and of his inability to control his feet. Dr. Bragdon found no evidence of root compression or root pain on this examination. Thereafter, while in the care of Dr. Faix, it was determined that the left leg of the plaintiff had atrophied; also a bizarre type of reflex spasm was evident on the left side of the plaintiff's spine. The femoral pulse on the left side was noted to have diminished in comparison to the right side.

At that point, Dr. Faix concluded that a neurologist should be consulted, and sent the plaintiff to Dr. William S. McCabe, Jr., in Pittsburgh, who conducted a neurological examination on May 15, 1955, and in three subsequent visits in June of 1955. As a result of these examinations, along with a study of the hospital records theretofore compiled, Dr. McCabe found that the ankle jerk and knee jerk on the left leg were diminished and at another time were absent. He also found that the femoral pulsation on the left leg was markedly diminished, the left leg was shortened approximately an inch to an inch and a half, and was reduced in circumference in the vicinity of one inch. There was a reduction to a complete loss of the sensory findings on the left leg. He found that the patient walked with a limp and exhibited a marked curvature of the spine. With pressure on the sciatic nerve, there was objective evidence of muscle spasm. It was the doctor's opinion that the patient's contact with the ground definitely had a bearing on the symptoms found. His interpretation of the X-rays taken was that the spine exhibited a curvature as the normal result of the operation. It was Dr. McCabe's opinion, as a neurologist, based on the above symptoms, that there were objective signs of root compression of the cord in the back. He explained that between the first and second protective coverings of the spinal cord, the pia mater and the arachnoid meninges respectively, flows the cerebrospinal fluid which circulates in the subarachnoid space from the brain down through the spine. This fluid serves the purpose of a cushioning agent and also supplies nutrition to the cord proper. Dr. McCabe had an additional myelogram done upon the plaintiff after his diagnosis of compression upon the spinal nervous system. As the result of the myelogram, the attendant X-ray taken, and the other symptoms exhibited, the doctor concluded that there was an impingement on the spinal cord at the level of L 3, since the fluid injected both above and below this vertebra in the subarachnoid space was blocked from passage in either direction. The doctor's diagnosis of this situation was termed arachnoiditis. He stated that it is a slowly progressing and permanent proposition which will lead to a type of paralysis. The doctor testified that a

partial paralysis was evident at the time of his examinations. He stated that he would be opposed to an effort to correct the condition by surgery as, in his opinion, surgery would render the plaintiff's back unstable. It was Dr. McCabe's opinion that the plaintiff would be unemployable in the labor market.

Thus it is at once apparent that on the issue of damages there was ample evidence to support the jury's verdict. There is no disagreement among plaintiff's three physicians as to the cause of his disability in the first instance. Surgery was performed. The extent of his recovery was the subject of medical opinion and conclusion. On the extent of the recovery the three physicians for the plaintiff were not entirely in accord in their views, but extent of the recovery was left to the jury in what the court believes were proper instructions, not objected to by the defendant. Therefore, as a matter of law, giving consideration to this phase of the case on the motion for judgment notwithstanding the verdict, the verdict should stand.

Second: Motion for a New Trial

A motion for a new trial is entirely independent from a motion for judgment notwithstanding the verdict, and is governed by different principles. It is addressed to the trial judge's discretion. See Magee v. General Motors Corp., 3 Cir., 213 F.2d 899. Consideration should be given as to whether the verdict was contrary to the weight of the credible evidence. As the trial judge in this case, I felt satisfied at the time the verdict was received that under the evidence it was fair and proper. The verdict might have gone either way on the issue of liability. There was considerable evidence on the part of each litigant as to the condition of the Yard and as to whether defendant furnished an unsafe place for plaintiff to work. The question of drainage was testified to at length by witnesses for both sides. It is felt that the witnesses for both litigants on this point were credible and as free from interest and bias as could be expected. Reasonable men might well differ on the factual situation as it related to liability. The jury verdict has closed this issue.

Weather Report for April 19 and 20, 1953, Defendant's Exhibit "F"

Defendant, in its motion for a new trial, claims error on the part of the trial judge in sustaining plaintiff's objection to the offer of Defendant's Exhibit "F". This offer and its rejection by the court is covered in one page of a four hundred twenty-three page trial record. At the time it was offered in evidence it seemed to me that it was a matter of very slight, if any, probative value whether it was admitted or rejected. The purpose of the offer was not mentioned by defendant's counsel at the time he made it. However, the exhibit was examined by the court. The weather station at the Akron-Canton Airport is twenty miles away from the Brewster Yards. The weather report for the 19th of April, 1953 showed that the highest temperature was 39 and the lowest was 24 degrees. The 24-hour precipitation was 0.06 inch, which fell as 0.7 inch of snow. It is noted that at the end of the day there was an inch of snow on the ground. That would mean there was an inch of snow at midnight on the 19th, twenty miles from the Brewster Yards. On the 20th, the date on which plaintiff was injured, the 24-hour precipitation was 0.03 inch, twenty miles away, "which fell as 0.7 inch of snow." Still at the end of the day an inch of snow remained on the ground. There was no showing or offer to show that the weather at the airport compared at all with the weather at the Brewster Yards. At that time of the year the weather might be different, and apparently was, according to the testimony of plaintiff's witnesses. It is noticed that in defendant's brief it stresses the fact that the weather report mentions the maximum and minimum temperatures, as well as precipitation, throughout the two days. It says that the temperature twenty miles away was important because of the possibility of snow being on the ground where plaintiff slipped. However, in its offer no mention was made that the exhibit was being

introduced to show the temperature in the Brewster Yards or any temperature relatively nearby. The weight of the evidence unquestionably established that the area in question in the Brewster Yards was soft and unfrozen. In any event, the court feels that there was no error in rejecting the report of temperature and precipitation 20 miles away, especially considering that at the airport the 24-hour precipitation was 0.03 of an inch and bearing in mind plaintiff's evidence that it had been raining all week, but having in mind also the uncertainty as to whether it was raining on the day of the accident. If any error was committed, it is felt that it was harmless and that it did not affect the verdict or affect the substantial rights of the parties. See Rule 61, Federal Rules of Civil Procedure.

### Plaintiff's Injuries and Damages

Defendant, in its brief, says: "The findings of the jury that the plaintiff is permanently injured and will be unemployable in the future are based upon a mere guess." Defendant cites Mudano v. Philadelphia Rapid Transit Co., 289 Pa. 51, 137 A. 104, where the Supreme Court of Pennsylvania held that where plaintiff has the burden of proof on an issue, and his testimony and that of his witnesses in its essential conclusions is inconsistent, the jury verdict can only be based upon a conjecture or guess and the plaintiff has failed to meet his burden of proof.

The medical testimony introduced on plaintiff's behalf has been reviewed in giving consideration to the motion for judgment n. o. v. In examining the evidence on the motion for a new trial, it is my view that the weight of all of the credible evidence and other relevant factors requires that the verdict of the jury on the issue of damages stand. The weight of the evidence supported plaintiff's contention that his physical condition has deteriorated and gradually and progressively has worsened since he was hurt. Plaintiff presented the appearance of a sick man. His physical movements in and about the courtroom indicated some degree of paralysis. He presented the drawn and weak look of a man suffering some major disability.

Defendant's medical evidence tended to dispute the extent of plaintiff's injuries. It is to be recalled that Dr. Bragdon operated on lumbar vertebrae Nos. 4 and 5 and removed the discs. Neither of defendant's medical witnesses, that is Dr. Thomas or Dr. Slasor, would admit that anything was wrong with these two vertebrae. However, Dr. Thomas did say that the X-rays indicated that vertebrae L 1 and L 2 showed evidence of prior fracture. The X-rays from which he testified were taken prior to surgery. It should be, of course, emphasized that Drs. Bragdon and Faix had an opportunity of examining the vertebrae at the time the surgery was performed so that it should be accepted that the fractures, if any, took place on L 4 and L 5. It is significant that no surgery was done on vertebra L 1, which is the one that Dr. McCabe said was blocked as shown by his myelogram and X-ray and was the point at which the compression of the spinal cord is taking place. Plaintiff disclaimed any prior injuries which would cause fractures to L 1 and L 2. Assuming that the vertebrae trouble came from the injury received on the date in question, Dr. McCabe's testimony is not inconsistent and contrary to the other physicians' conclusions, but apparently is based on a progression resulting from what he stated to be the impingement of the spinal cord. The testimony of Dr. McCabe was not contradicted by defendant, but it becomes apparent on examination of this evidence that the jury in accepting Dr. McCabe's conclusions was not guessing or speculating but had substantial evidence on which to base its verdict. As its verdict shows, it accepted the conclusions of the plaintiff's medical witnesses.

Finally, as to the size of the verdict, plaintiff was thirty-five years of age at the time he was hurt. He had a good working record. His earnings in the two years prior to his injury averaged over $4,380 annually. His life ex-

pectancy was over thirty-three years. Giving consideration, therefore, to the evidence as to his earning record, the loss of earning power, his pain and suffering and other factors, the verdict seems correct. In summary, it suffices to say that reasonable men could very well differ on the issue as to the extent of plaintiff's injuries, on his loss of earning power, and whether plaintiff is progressively becoming a paralytic or whether he will recover. It was an issue for the jury and the jury's verdict should put an end to this issue.

Both motions will be refused.