**Kenneth V. DILL**

v.

**Clayton L. SCUKA, M. D.**

**Civ. A. No. 20539.**

United States District Court
E. D. Pennsylvania.
June 23, 1959.

Lester H. Novack, Dennis, Lichtenstein, Cohen & Dennis, Philadelphia, Pa., Marshall Miller, Washington, D. C., for plaintiff.

Thomas E. Comber, Jr., Pepper, Bodine, Frick, Scheetz & Hamilton, Philadelphia, Pa., for defendant.

EGAN, District Judge.

Essentially this is an attempt to fasten vicarious liability on a treating doctor who called in a specialist, with the patient's consent, to perform an aortogram, in which effort the expert was unsuccessful, the attempted aortogram having been performed by the expert in the absence of the treating doctor who did not assist in any way at the time.

Secondarily, plaintiff seeks to impose liability on the treating doctor on the ground that he abandoned the plaintiff after the unsuccessful attempts to perform the aortogram and failed to prescribe other forms of therapy which might have brought relief.

There is no merit to either contention.

This is a diversity case in which all the action, except the trial, took place in Wichita, Kansas. At the time of the occurrence, the defendant, Scuka, lived and practiced medicine in Wichita, Kansas. When he was sued in this Court, he was filling a residency at the Lankenau Hospital in Overbrook, Philadelphia, and was living at Havertown in the Eastern District of Pennsylvania.

The case was tried, for the most part, on depositions. The only "live" witnesses appearing at the trial were the plaintiff and his wife and two doctors who were called in to give expert testimony, namely, Doctor Benjamin Manchester, of Washington, D. C., a graduate of the George Washington University School of Medicine and Doctor Abol Khajavi, a graduate of the University of Iran Medical School, who at the time was serving a residency at Jefferson Medical College in Philadelphia.

The action came on for trial on January 26, 1959. At the conclusion of plaintiff's case on February 3, 1959, the Court granted defendant's motion for involuntary dismissal under F.R.Civ.P. 41 (b), 28 U.S.C.A. On February 12, 1959 plaintiff filed his motion to set aside the judgment of involuntary dismissal and for a new trial. The matter was heard on briefs and argument of counsel in open Court on April 20, 1959. It is now ripe for decision.

Defendant, Dr. Clayton L. Scuka, a general practitioner in Wichita, Kansas, in 1954, had under his care at the Wesley Hospital there the plaintiff, Kenneth V. Dill, whom he was treating for a blood clot which affected the calf and foot of his left leg, which interfered with his ability to perform his duties as service specialist or "troubleshooter" for the local gas company. He was stricken while waiting in his office on the midnight shift for a call. He had fallen asleep sitting in a chair with his feet on his desk. Two other blood clots developed in his chest while he was under treatment at the hospital and they disappeared after he was given a hypodermic needle.

In order further to diagnose the tendency to blood clotting found in his pa-

tient, Doctor Scuka requested the staff urologist, Dr. Miles, and the staff radiologist, Dr. Hershorn, to perform an aortography on the plaintiff.

Plaintiff consented to the procedure and discussed it at various times with Dr. Scuka and Dr. Miles. The latter made a physical examination of plaintiff, checked his prothrombin time and apparently found him satisfactory for aortography. A general anesthesia was administered by the staff anesthetist. In the attempted injection of dye into the aorta, Dr. Miles was not satisfied with the nature of the blood found in the patient and discontinued the procedure. Dr. Scuka was not present at the procedure and had no control over it. The patient knew that Dr. Miles and not Dr. Scuka would perform it.

About a week after the attempted aortogram, during which time plaintiff suffered great pain and thrashed about in bed, plaintiff's nerve functions in his lower extremities deteriorated and he lost control of his lower legs from the hips down, became unable to urinate and have normal bowel movements and lost the ability to copulate. He suffered what has been described as "a flaccid paralysis."

Plaintiff's evidence proceeded to show the following: Although there was no direct evidence of a puncture of the aorta, the largest artery in the body which is attached to and follows the external wall of the spinal column, or the spinal column itself which is encased in and protected by a hard bony tube, that there was an involvement of the spinal cord; that there must have been some hemorrhaging in the area of plaintiff's back where the punctures were attempted; that in some unexplained way, some blood must have seeped into and through the osseous wall of the tube in which the spinal column is encased; that this caused a blood clot, or stoppage, or obstruction at the first lumbar vertebra which interfered with fluid which circulated in the spinal column (this is not blood—it is a fluid surrounding the brain

and spinal cord so that it absorbs the jars of daily activity); that this brought about a transverse myelitis, i. e. the substance of the cord which carries the nerve tracks, the impulses from the higher centers above the cord became inflamed or irritated and ultimately destroyed; that this condition could be caused by many things and in this case "it was related to the aortogram, the procedure done for diagnosis" by Dr. Miles. Testimony of Dr. Manchester, pp. 29, 30.

Before we examine the two theories on which plaintiff seeks to impose liability on Dr. Scuka, we shall look at the applicable law.

■ Issues arising in actions in the Federal Courts by virtue of diversity of citizenship are governed by the law of the place where the injury was sustained sofar as whether a right of action exists, in this case, Kansas. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Company v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Goodrich Handbook of the Conflict of Laws, pp. 33–38. However, the law of the forum, in this case, Pennsylvania, governs as to rules of evidence, burden of proof and whether there is sufficient evidence of negligence or proximate causation to have the case submitted to the jury. Restatement, Conflict of Laws, sections 378, 380; Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 166 F.2d 908; Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 68 A.2d 517; Singer v. Messina, 312 Pa. 129, 167 A. 583, 89 A.L.R. 1271.

■ The burden of proving malpractice by a fair preponderance of the evidence remains on plaintiff throughout the trial.

■ 1. Plaintiff contends that defendant was negligent in recommending an aortogram to be used on him as a diagnostic procedure. As the evidence developed at the trial, plaintiff read into the record the depositions of a num-

ber of doctors, including those of Dr. Hershorn and Dr. Miles. As such, they become plaintiff's witnesses. F.R.Civ. P. 26(f).

Dr. Miles' function was to inject dye into the aorta. It was Dr. Hershorn's function to take the X-Ray picture after the dye had been injected.

The competency of Dr. Miles is found in his testimony that he had performed between three and four hundred prior aortographic procedures. Neither the expertize of Dr. Miles nor the competency of Dr. Hershorn and the anesthetist are questioned here.

Defendant, as the attending physician, by recommending a procedure to be performed by a specialist, is not liable for the alleged negligent acts of the specialist. In Huber v. Protestant Deaconess Hospital Ass'n, 1956, 127 Ind.App. 565, 133 N.E.2d 864, at pages 869, 870, the Court wisely said:

"In this age of specialization in the practice of medicine it is the duty and function of courts of law to apply rules of law with an intelligent understanding of developing civilization in the field of medicine and surgery. Certainly it would be unjust to hold a family physician responsible for negligent acts of a surgeon whom he might recommend. 46 A.L.R. 1454; Nelson v. Sandell, 1926, 202 Iowa 109, 209 N.W. 440, 46 A.L.R. 1447; Mayer v. Hipke, 1924, 183 Wis. 382, 197 N.W. 333; Brown v. Bennett, 1909, 157 Mich. 654, 122 N.W. 305.

"While Dr. McDonald requested that the hospital furnish an anesthetist it appears to this court that there is nothing shown in the circumstances of this record, when applied to the existing rules of law, which would render the appellee, Dr. McDonald, liable for the negligent acts of this trained specialist."

No causal connection was shown between plaintiff's present condition and the attemped aortogram in 1954.

Plaintiff was examined by Dr. Manchester at the George Washington University Hospital in Washington, D. C. in May 1955, where he had been taken for the purpose. When asked what was the cause of plaintiff's condition as he observed it, Dr. Manchester replied (N. T. p. 30): "I think it was related to the aortogram, the procedure done for diagnosis."

This conclusion underlies much of the testimony of Dr. Hyde (Ex. P-22).

Dr. Miles and Dr. Manchester disagreed. Dr. Miles was asked whether he had ever told the plaintiff that his condition was not due to the attempted aortogram. His reply was, "I don't know why I would even think of telling him because in my own mind I knew it wasn't." Ex. P-9, N. T. 138.

Earlier Dr. Miles had given his opinion that neither cord involvement nor paralysis could result from translumbar aortography. Ex. P-9, N. T. 77.

Dr. Bacon's deposition was read into evidence by plaintiff. He also disagreed with Dr. Manchester. Dr. Bacon examined plaintiff in June of 1955. He was questioned concerning the cause of plaintiff's condition:

"Q. Did you feel there was any possible causal connection between the man's condition and the attempted aortogram? A. I did not, or let's put it this way: I didn't know what his trouble was at that time, but I didn't see how passing a needle into the paravertebral region could possibly have produced the extensive neurological loss the patient had." Ex. P-18, N. T. 24.

All down the line there was a direct conflict among plaintiff's medical witnesses as to whether the attempted aortogram caused plaintiff's condition.

A source of major conflict during the trial was whether plaintiff should have been exposed to aortography at all, since he was on anticoagulent therapy.

Doctors Manchester and Hyde stated that aortography is a dangerous and rad-

ical diagnostic procedure. Dr. Manchester has stopped performing aortograms. N. T. p. 77. He said that where plaintiff's prothrombin time was 39 seconds, the aortogram was an unsafe procedure. N. T. p. 63. On cross-examination, Manchester went even further and stated that in his opinion aortography is most hazardous where there is evidence of general arterial deterioration of the vascular system. N. T. pp. 85–88.

Dr. Hyde, in answer to a hypothetical question propounded by plaintiff's counsel, failed "to see that there was either an indication for an aortogram or a possibility that the aortogram as such might provide helpful diagnostic information." Ex. P–22, N. T. p. 48. Further he stated that it was his opinion that the prothrombin time of 39 seconds or 38% was a borderline case and should in the ordinary course of events be corrected prior to initiating an operative procedure. Ex. P–2, N. T. pp. 48, 49.

Dr. James Fisher of Wichita, who had some years earlier treated plaintiff's father, was called in as a consultant at plaintiff's request. His deposition was introduced in evidence by plaintiff. Ex. P–1. At page 35 thereof, he stated that the injection of dye into the femor, or the aorta, would be one method [1] of diagnosing the presence of thromboangiitis obliterans or Buerger's Disease (a breakdown in the cardio-vascular system) (idem pp. 21, 22). He felt that, although there was a little more danger where the patient was under anticoagulant therapy, the figure of 39% prothrombin time was a "rather conservative figure" (id. pp. 1–33).

Dr. Miles, who, as already indicated, had performed between three and four hundred aortographies himself, stated that he would get a clue from the aortogram as to the presence of Buerger's Disease (Ex. P–9, N. T. 101), and that this diagnosis could be confirmed or possibly disproved by this procedure (id. p. 93). He would not have attempted the procedure if he had not agreed with Dr. Scuka that there was a possibility of arterial involvement (id. p. 93). At the time of the attempted procedure, he knew the prothrombin time and in his opinion, it was not at a dangerous level (id. pp. 62, 64).

It is clear that plaintiff's medical witnesses disagreed on a basic issue. These are not minor points of difference but go to the very heart of the case. With respect to such contradictions among experts on the plaintiff's side of the case, see Menarde v. Philadelphia Transportation Co., 1954, 376 Pa. 497, at page 501, 103 A.2d 681, at page 683.

Besides, it is fundamental that an inference cannot be added to an inference to arrive at a conclusion of liability. Here plaintiff wants us to infer that there was a hemorrhage of his back, that blood seeped into his spinal column, that it there formed a clot or set up an irritation that destroyed the nerves leading to plaintiff's lower extremities, thus causing his present condition.

"The decisions are generally agreed that a presumption must rest upon facts proved by direct evidence and cannot be based upon, or inferred from, another presumption * * *." 20 Am.Jur. § 164.

"The broad rule that an inference cannot be based upon an inference to establish a fact necessary to be proved upon a trial applies to a wide variety of situations. Thus, while negligence, as well as the manner in which an accident occurred, may be inferred from known or established facts and circumstances, such an inference must be founded upon some known or established fact, and cannot be conjectured from other inferences * * *." 20 Am.Jur. § 165. See annotation 95 A.L.R. 173.

1. Dr. Fisher also testified that it is possible to determine whether there is an arterial involvement in the lower extremities by doing a muscle biopsy but he stated that, "It is frequently not a definitive treatment * * *." In other words, it would not have been a surefire method of diagnosis.

It has also been suggested that Dr. Miles, the specialist called in to perform the aortogram, was a "mere technician" and that Dr. Scuka, the general practitioner who called him in, bears primary responsibility for the so-called negligence of Dr. Miles. The mere statement of such a proposition is an answer to it. There was no relationship of employer and employee or of principal and agent, between the two doctors. Each treated plaintiff independently of the other. To hold otherwise would be a wrongful application of the rule *respondeat superior*. See Black's Law Dict., 4th ed., p. 1475.

2. The second major premise advanced by plaintiff is that defendant practically abandoned plaintiff after the aortogram failed and withheld timely recommendations as to employing other specialists to assist in diagnosing and treating him. This is quite the reverse of the first. The thrust of plaintiff's first premise is that defendant wrongfully failed to recommend a specialist or specialists to assist him in rendering after-care.

We have examined the Kansas cases cited by plaintiff and we are convinced that they do not support plaintiff's contention.

Besides, the facts do not support him. Thus Mrs. Dill, wife of plaintiff, testified (N. T. pp. 129, 130) that Dr. Scuka called in Dr. Drake and Dr. Bacon within a few days after the attempted aortogram. The plaintiff himself testified that they examined him "within two or three days, three or four days anyway. I would say within three or four days of the aortogram." Plaintiff's deposition, pp. 204, 205.

Plaintiff relies heavily on the 1958 Kansas Supreme Court case of Cassity v. Brady, 182 Kan. 381, 321 P.2d 171. That case may be distinguished on its facts. The Court's opinion does not bear on a case where the plaintiff's evidence shows that the attending physician recommended a procedure to be performed by a specialist and where the patient, after discussing the procedure with the specialist, consented to it, knowing that the specialist and not the attending physician was to perform it.

More in point is the California case of Salgo v. Leland Stanford Jr. University Board of Trustees, 1957, 154 Cal.App.2d 560, 317 P.2d 170 which cites the Indiana case of Huber v. Protestant Deaconess Hospital Ass'n, supra, with approval. There the Court said (317 P.2d at pages 178, 179):

"Of course, the furnishing by the hospital of a surgical team would not relieve the attending surgeon of his obligation to determine the competency of such team. (One of plaintiff's contentions is that Dr. Gerbode failed in this duty). But to hold that the attending surgeon who does not participate nor have the right to participate in the procedure is liable for the acts of a competent team supplied by the hospital would be against the best interests of patients generally. The patient by the use of such a team gets the benefit of medical people who have become experts in the particular procedure."

Little noticed, but of much importance in the background of this case, is a prior injury suffered by plaintiff which kept him in a Wichita hospital about ten weeks. As plaintiff relates it, "In about November of 1929 a car hit me at an intersection while I was walking and broke my left leg just above the ankle and broke my right arm and wrist." N. T. p. 134.

In January 1954, plaintiff first consulted Dr. Scuka about a soreness on the sole of his left foot and the calf of his left leg.

Dr. Scuka couldn't get him admitted to the Wesley Hospital that day but he succeeded in doing so the following. He remained there about 25 days and underwent a treatment of bed rest, keeping his left leg elevated and the application of

hot packs to his leg. He was discharged about February 23, 1954 and returned to work for about six days. At the end of that time, the soreness in his left leg returned and he went back to the hospital on March 9th under the care of Dr. Scuka. The latter related the blood clot to the scar tissue that formed after the injury to his left leg in 1929. Dr. Scuka was concerned and discussed his concern "as to how this previous injury could now be causing this trouble" with plaintiff, " * * * I know that he had the leg X-rayed, and after having it X-rayed suggested that the bone seemed to have grown more where it was broken, over the one groove against the other, where the nerves and blood vessels passed down between, and they might be pinched there between the two bones." N. T. p. 139.

While at the hospital the second time, plaintiff suffered two embolisms in the chest caused by blood clots which disappeared after treatment. Plaintiff continued at the hospital and in early April, "Dr. Scuka suggested that although I was getting along all right, he thought he better see if he could determine if the cause of the clot where the break in my bone, my left leg, had occurred back in 1929, to see if that had caused it and he suggested an X-Ray of the blood vessels by injection of dye in my left foot, which was attempted, but wasn't completed. It wasn't * * * they wasn't able to complete it * * *." N. T. pp. 141, 142.

He also testified that the doctors had first tried unsuccessfully on five occasions to take an X-Ray of his legs by tapping a vein there and injecting some dye. They couldn't find a vein to take the tap. N. T. pp. 196, 197. An arterial tap was then suggested and the attempted aortogram followed.

Because of this testimony, there is as much reason to believe that plaintiff's peripheral vascular problems and his present condition are due to his accident in 1929 as to the attemped aortogram in 1954. They are both speculative.

Plaintiff has not only failed to produce competent and convincing evidence of negligence on the part of defendant, but has also failed to show that plaintiff's present condition was caused by or resulted from defendant's conduct. Vaccaro v. Marra Bros., Inc., D.C.E.D. Pa.1955, 130 F.Supp. 12 (opinion by Grim, J.); Powell v. Risser, 1953, 375 Pa. 60, 68, 99 A.2d 454.

Finally, plaintiff suggests through the testimony of Dr. Manchester that an operation known as a laminectomy should have been performed within 120 hours after the attempted aortogram. Dr. Manchester describes a laminectomy as an operation in which one opens up the subarachnoid space and aspirates it, sucks up the blood therein, washes it out with saline and injects some steroid solution. Dr. Manchester performed one such operation and concluded that a laminectomy "might have been helpful * * * to reduce the tendency for inflammatory reaction," and referring to plaintiff's condition, "might have prevented this." N. T. pp. 90, 92. This is the only evidence in the record in which an attempt is made to link defendant's alleged negligence after the attempted aortogram and plaintiff's condition. Such evidence is insufficient as applied by the tests established by the Pennsylvania Courts. Powell v. Risser, 375 Pa. 60, 68, 99 A.2d 454, supra; Vaccaro v. Marra Bros. Inc., D.C., 130 F.Supp. 12, supra. In the latter case, the Court said (130 F.Supp. at page 14):

"In order to link her impaired physical condition to the defendant's conduct, the plaintiff was forced to depend on expert medical testimony because scientific knowledge was required for the elucidation of the question * * *. Moreover the expert has to testify, not that the condition of claimant might have, or even probably did, come from the accident, but that in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof

and does not constitute legally competent evidence. Vorbnoff v. Mesta Machine Co., 286 Pa. 199, 206, 133 A. 256; Powell v. Risser, 375 Pa. 60, 68, 69, 99 A.2d 454 * * *."

In other words, Dr. Manchester's testimony is a mere guess and falls below "the required standard of proof and does not constitute legally competent evidence."

The plaintiff has failed to sustain his burden and there is nothing on which a jury could base a finding against defendant. See Mundano v. Philadelphia Rapid Transit Co., 1927, 289 Pa. 51, 137 A. 104 and the cases in its train, including Norwood v. Great American Indemnity Co., D.C.E.D.Pa.1943, 51 F.Supp. 832; Widder v. New York, Chicago & St. Louis R. Co., D.C.W.D.Pa.1955, 142 F.Supp. 830.

"If the plaintiff cannot show the possibility of a conclusion of defendant's negligence supported by a clear preponderance of its likelihood * * * and excluding other probabilities just as reasonable * * * the plaintiff should not be permitted to go to the jury. The circumstances must compel the conclusion that the defendant was negligent. * * * The jury may not be allowed to guess." Nash v. Raun, 3 Cir., 1945, 149 F.2d 885, 888, certiorari denied 326 U.S. 758, 66 S.Ct. 99, 90 L.Ed. 455; Medina v. All American Bus Lines, Inc., 5 Cir., 1945, 152 F.2d 61; Warren v. Haines, 3 Cir., 1942, 126 F.2d 160. Compare Ebersole v. Beistline, 1951, 368 Pa. 12, 82 A.2d 11.

We believe that there is no clash between our conclusion and that of the Court of Appeals in this Circuit as expressed in Johnson v. Baltimore & O. R. Co., 3 Cir., 208 F.2d 633 and Larkin v. May Department Stores Co., 3 Cir., 250 F.2d 948, which are distinguishable on their facts.

The above constitutes our findings of fact and of law. Plaintiff's motions to set aside judgment of involuntary dismissal under Rule 41(b) and for a new trial will be dismissed.