Kenneth V. DILL, Appellant,

v.

Clayton L. SCUKA, M.D.

No. 13053.

United States Court of Appeals
Third Circuit.

Argued Feb. 19, 1960.

Decided May 27, 1960.

Marshall E. Miller, Bernard Gordon, Washington, D. C., Joseph B. Danzansky, Raymond R. Dickey, Milton Quint, Robert F. Rolnick, Robert S. Schoshinski, Washington, D. C., Milton Zacharias, Kenneth H. Hiebsch, Richard A. Render, Wichita, Kan. (Albert L. Kamas, Wichita, Kan., Lester H. Novack, Philadelphia, Pa., on the brief), for appellant.

Thomas E. Comber, Jr., Philadelphia, Pa. (Edward W. Madeira, Jr., Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

Two interrelated questions are raised by the plaintiff-appellant in this malpractice suit: (1) whether there was any vital inconsistency in the expert medical testimony he proffered in support of an essential element of his claim, and (2) assuming there was such inconsistency, was the district court justified in granting defendant's motion for involuntary dismissal under Federal Rule of Civil Procedure 41(b), 28 U.S.C.

This is a diversity case in which all the action, except the trial, took place in Wichita, Kansas. At the time of the incidents involved, the defendant, Dr. Clayton L. Scuka, lived and practiced medicine in Wichita, but he has since removed to the Philadelphia area and presently resides in Havertown, Pennsylvania.

The case was tried, for the most part, on depositions; the only live witnesses besides the plaintiff and his wife were two physicians called to give expert testimony. Following the presentation of plaintiff's case, the court dismissed the action on defendant's motion and later denied a motion to set aside the judgment of involuntary dismissal and for a new trial.[1]

The plaintiff, Kenneth V. Dill, was employed as a service specialist or troubleshooter for a Wichita gas company. While waiting in his office during the midnight shift, he had fallen asleep on a chair with his feet on his desk. Upon awakening he experienced pain in his left leg, in the region of the calf. He consulted defendant who hospitalized him on March 9, 1954. The pain was diagnosed as resulting from a blood clot, and while under treatment at the hospital plaintiff suffered two embolisms in the chest, which disappeared after treatment. During the period of hospitalization the plaintiff was administered anticoagulants in order to control the blood clotting.

To further diagnose the cause of the blood clotting, defendant requested that the staff urologist, Dr. Miles, who had previously performed over 300 aortograms,[2] perform one on the plaintiff. Plaintiff consented to the procedure and discussed it at various times with both doctors. Dr. Miles examined the patient, checked his prothrombin time[3] and decided to proceed with the aortogram. Following administration of anesthesia, Dr. Miles attempted to inject dye into the aorta; however, he was not satisfied with the nature of the blood which appeared in the needle and discontinued the procedure. The patient had been apprised of the fact that Dr. Miles and not Dr. Scuka would perform the aortogram and that the latter would not be present.

In the week following the attempted aortogram, plaintiff suffered great pain and thrashed about in his bed. The nerve functions in his lower extremities deteriorated, and he lost control of his legs from the hips down. In addition,

---

1. The opinion of the district court is reported at 175 F.Supp. 26 (D.C.E.D.Pa. 1959).

2. Defined as a diagnostic surgical procedure in which (while the patient is under general anesthetic) a long, hollow, 18 gauge needle, 14 centimeters long, is inserted in the back until it touches the tip of the twelfth vertebra; it is then partially withdrawn and its direction changed, and reinserted so that it enters the aorta itself, at which time dye is injected and x-rays of the area are made.

3. Prothrombin time is a test used to measure a substance that is in the blood which plays a major role in clotting.

he was unable to urinate and have normal bowel movements and lost the ability to copulate. His condition was described as "flaccid paralysis." Plaintiff contends his present condition results from the attempted aortogram and that the defendant was negligent in ordering this procedure under the circumstances. He additionally contends the defendant was negligent in failing to perform a laminectomy to relieve the condition resulting from the aortogram.

▆▆▆ This being a case in the federal courts solely by virtue of diversity of citizenship, the court applies state law and takes its law from the authoritative decisions of the forum, including conflict-of-law rules. Since all the operative facts took place in Kansas, Pennsylvania law refers to Kansas, the place of wrong, for the legal effect to be given them. Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 1948, 166 F.2d 908, certiorari denied 1948, 334 U.S. 846, 68 S.Ct. 1516, 92 L.Ed. 1770, and Pennsylvania cases collected therein at footnote 3, page 910 of 166 F.2d. It is equally well settled that the application of Pennsylvania conflict-of-law rules determining whether a given question is to be characterized as substantive, with reference to the foreign law, or procedural, where the reference will be to the law of the forum, controls us here. Moran v. Pittsburgh-Des Moines Steel Co., supra, 166 F.2d at page 910. Thus, in regard to whether a right of action exists, Pennsylvania law calls for a referral to that of Kansas; however, as to the sufficiency of the evidence, a Pennsylvania court, heeding the Pennsylvania case of Sudol v. Gorga, 1943, 346 Pa. 463, 31 A.2d 119, would apply the law of the forum.

The appellant notes that in determining the sufficiency of the evidence, we held "the federal court in a diversity case should follow the state's rule." Moran v. Pittsburgh-Des Moines Steel Co., supra, 166 F.2d at page 917.[4] However, he contends, in effect, that this was an unwarranted extension of the doctrine

set forth in Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, inasmuch as even that doctrine is subservient to the right to jury trial under the Seventh Amendment to the Constitution of the United States. In support of this proposition, appellant relies upon Herron v. Southern Pacific Co., 1931, 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857, a case decided before Erie Railroad Co. v. Tompkins but recently given new life by its citation in Byrd v. Blue Ridge Rural Electric Cooperative, Inc, 1958, 356 U.S. 525, 538, 78 S.Ct. 893, 2 L.Ed.2d 953. In addition, appellant cites Dick v. New York Life Ins. Co., 1959, 359 U.S. 437, 79 S. Ct. 921, 3 L.Ed.2d 935, and Magenau v. Aetna Freight Lines, Inc., 1959, 360 U.S. 273, 79 S.Ct. 1184, 3 L.Ed.2d 1224. None of these cases directly rule upon this issue, nor does appellant claim that they do, but rather they indicate a conflict in the circuits that will be reviewed by the Supreme Court when the point is appropriately raised. Dick v. New York Life Ins. Co., supra, 359 U.S. at page 445, 79 S.Ct. at page 926.

▆▆▆ This case, however, does not require us to review our holding in Moran v. Pittsburgh-Des Moines Steel Co., supra, for we are of the opinion that the federal rule as to the sufficiency of the evidence would be exactly the same as the Pennsylvania rule. The Pennsylvania rule on expert witnesses was clearly stated by Chief Justice Moschzisker in Mudano v. Philadelphia Rapid Transit Co., 1927, 289 Pa. 51, 61, 137 A. 104, 107–108:

"* * * Moreover, we do not mean, by anything said in this opinion, to intimate that, whenever a litigant calls experts and they disagree, this necessarily destroys his case on the particular point of disagreement; what we do mean is that, when plaintiff has the burden of proof on an issue of fact which goes to the essence of any material part of his case, and he selects scientific experts to speak for him, be-

4. Cf. Lind v. Schenley Industries, Inc., 1960, 3 Cir., 278 F.2d 79.

cause the point at issue can be solved only in that way, such experts are peculiarly his mouthpiece,—they take his place and, so far as the rule laid down in the line of cases first mentioned in this opinion is concerned, may be viewed as though they collectively were the plaintiff himself. If, after being equally accredited by plaintiff, witnesses of the character just described so vitally disagree on essential points as to neutralize each other's opinion evidence, their sponsor has not borne the burden of proof which the law casts upon him, and to that extent has failed to make out his case,—though, in our opinion, minor points of difference between such witnesses should not be thus viewed."

In accord: Menarde v. Philadelphia Transportation Co., 1954, 376 Pa. 497, 103 A.2d 681.

In analyzing the expert testimony offered by the plaintiff's medical witnesses we have, for the purposes of the above-stated rule, ignored the testimony of Dr. Miles, the specialist who performed the aortogram. We agree with the appellant that Dr. Miles was a necessary witness and that he should not be bound by all of Miles' testimony, for he was indeed a borderline hostile witness.[5] As we stated in Johnson v. Baltimore & Ohio R. Co., 3 Cir., 1953, 208 F.2d 633, 635, certiorari denied, 1954, 347 U.S. 943, 74 S.Ct. 639, 98 L.Ed. 1091,

"* * * But when witnesses are called, in some stranger's lawsuit, to tell about things they saw, heard, or did, there is no reason in logic or common sense or fairness why the party who calls them should have to vouch for everything they say."

■ We must determine whether there is a clear conflict amongst the independent medical experts, excluding Dr. Miles. Thorough study of the testimony indicates that a jury could reasonably conclude that Doctors Manchester and Hyde were of the opinion that prescribing an aortogram for the plaintiff under the conditions which obtained fell below the standard of medical practice in the community.[6] The appellee in his brief refers us to the testimony of Dr. Fisher on this subject as being in vital disagreement. The testimony referred to is set

---

5. Dr. Miles was a defendant in a companion suit brought against him by plaintiff in the Kansas State courts. Dill v. Miles, 181 Kan. 350, 310 P.2d 896.

6. *Testimony of Dr. Manchester:*

"Q. Considering anticoagulants were being continuously administered because of this thrombophlebitis or blood clot in the leg, in other words, assume, however, that on the day of the aortogram, April 26, that the prothrombin time was 39 seconds. In view of that condition, as well as the whole condition of the patient, under those circumstances, in your opinion, was an aortogram a safe procedure? A. No, sir."

*Testimony of Dr. Hyde:*

"Q. Now, Doctor, in what way would there have been a deviation from the standard of practice? A. Well, again, it is a matter of opinion, and of course hindsight is different than foresight, but I fail to see that there was either an indication for an aortogram or a possibility that the aortogram as such might provide helpful diagnostic information.

"And of course another factor that raises a tremendous question is the modified or greatly altered condition of the blood: specifically the prothrombin time or the ability of the blood to clot, or conversely, the control of tendencies to bleed, which are commonly recognized as important where certainly any operative procedure is involved. And even slight injuries, as well as the introduction of a needle, might conceivably, well, initiate or precipitate bleeding in an individual who had a diminished prothrombin time. Certainly at the level of 20 per cent there is grave danger, and I think without a doubt that would be recognized by doctors in the community.

"Q. Doctor, may I interrupt you a minute. What about the prothrombin time of 39 seconds, 38 per cent? A. Well, that is equally important, and certainly it is borderline and would, again, cause concern, I think, among or for any doctor who would be considering an operative procedure. And in the ordinary course of events it would be corrected, in my opinion, prior to initiating an operative procedure."

out in the margin.[7]  We must conclude, however, that a fair reading of this testimony does not indicate a vital disagreement with Doctors Manchester and Hyde. In the first place, Dr. Fisher admitted he was familiar with aortography only in a

7. "Q. Have you read any literature in the field of lumbar aortography, to the best of your recollection? A. Oh, yes, I have read it. It is done in the hands of people who are accustomed to it. I think people who are familiar with it have no particular fear, if there is any particular indication they go right ahead and do it.

\* \* \* \* \*

"Q. Yes, right. A. But that I felt that an ordinary thrombophlebitis was more likely at that time.

"Q. Now could there be a serious consideration given to a diagnosis of thromboangiitis obliterans if all the arterial pulsations in the extremity had been present? A. I personally would not make a diagnosis if all the arterial pulsations are present and equal, unless I had some other good evidence.

"Q. Right. Now, Doctor, assuming that there were a lack of one or more pulsations in the extremity, which would give rise to a consideration of a diagnosis of thromboangiitis obliterans, what would be the process of pinning down that diagnosis? A. I believe that one of the most common methods would be continued observation.

"Q. Continued observation? A. Continued observation. There are other methods possible: By injecting a dye into the artery, the vessels can be visualized.

"Q. Would you inject that dye to visualize a possibility of thromboangiitis obliterans in the lower extremities, would you inject the dye into the femoral artery, for example? A. I don't feel I am qualified to give you a good opinion on that, because I have not done that. I have not done any arterial injections at all.

"Q. I see. A. I believe that either the femoral artery or the aorta would be the site.

"Q. The femoral artery or the aorta? A. Yes.

"Q. Do you have a sufficient knowledge to know which of those two procedures would be the less dangerous? A. I could make a presumption that the femoral artery would be less dangerous to inject.

\* \* \* \* \*

"Q. \* \* \* Would you have an opinion, Doctor, on the danger of hemorrhaging from the insertion of an 18 gauge, 14 millimeter long needle in the back some six times when a patient was on anticoagulant therapy with a 39 per cent of normal coagulation time? A. Well, I believe that whatever danger there might be of such procedures would be a little more if the patient were under anticoagulants. The figure of 39 per cent is not a radically low figure. That is a rather conservative figure.

"Q. Let's assume, Doctor, that three days after the procedure, or surgical process, or whatever you wish to describe the insertion of this needle, that the prothrombin time went down to 20 per cent of normal. Would there be apt to be bleeding in the tissues around the area where the needle insertion had been made? A. All I can give you is an opinion.

"Q. Yes. A. I believe that in three days that—probably I would feel no great concern over it. I am not sure that that is a valid—

"Q. Isn't the danger level 20 per cent or below, according to the chart I have here used at Wesley Hospital, it indicates that. A. Twenty per cent or below is lower than we like it.

"Q. At that level there can be spontaneous hemorrhaging, is that correct? A. Yes, there can be.

"Q. As a matter of fact there can be spontaneous hemorrhaging, depending on the individual, at higher levels? A. At times, yes.

"Q. Yes. Did you and Dr. Scuka ever discuss the advisability of performing an aortogram while Mr. Dill was on anticoagulant therapy? A. I don't remember discussing it with Dr. Scuka.

"Q. Did you discuss it with anyone as far as you can recall? A. I can't recall discussing it with anyone at all.

"Q. Would the use of anticoagulant therapy have any effect on the proposed surgery, in your mind? A. Surgery? Yes.

"Q. On an aortogram? A. That is a very difficult question.

"Q. Yes, sir. A. I don't know. It probably would be certainly a factor in my thinking. The dangers of releasing the patient from that, having another embolus—

"Q. Sure. A. —the dangers of the procedure involving—

"Q. Are you familiar, Doctor, of lumbar aortography? A. Only in a vague sort of way. You make a posterior approach—

"Q. You know what it is then? A. Yes.

"Q. You have never performed one yourself? A. No."

vague way. At no point does he categorically state it was proper procedure under the circumstances.

The appellee also contends that there was a vital disagreement among the experts as to the causal connection between the aortogram and plaintiff's condition. Doctors Manchester and Hyde both were of the opinion that the condition resulted from the aortogram.[8] Appellee refers us to the testimony of Dr. Bacon as being in conflict on this point. A review of his testimony, however, at best indicates he was uncertain as to the cause.[9]

This falls far short of the conflict referred to in Mudano.

■ Appellant also alleged post-operative negligence on the part of the appellee in that he failed to perform a laminectomy [10] following the aortogram. However, there was a lack of proof on this issue, for there was no evidence that failure to perform a laminectomy was action or inaction falling below the proper standard of practice. One expert, Dr. Manchester, merely indicated that such a procedure "might have been helpful," and that he had done it on one other

8. *Testimony of Dr. Manchester:*
   "Q. Doctor, will you tell me, in your opinion, as the examining and diagnosing physician, what was the cause of the condition as you observed it? A. I think it was related to the aortogram, the procedure done for diagnosis."
   *Testimony of Dr. Hyde:*
   "Q. Well, now, what other possible medical causes of cord involvement, if it exists, or the arachnoiditis, might have no relation to the aortography or the attempted aortography?
   *       *       *       *       *
   "Q. Yes. Well, what it boils down to is—Is this a fair statement, Doctor: That it is not possible to exclude any number of medical possibilities which you have touched upon, so far as the cause of this arachnoiditis of Mr. Dill, if it is present, isn't that right? A. Well, again, I think that is a matter of opinion, but I think just in my own thinking and speaking from a medical point of view, I think I would have no difficulty in excluding them, from a medical point of view. Now, legal, I don't know about."

9. *Testimony of Dr. Bacon:*
   "Q. Did you feel there was any possible causal connection between the man's condition and the attempted aortogram? A. I did not, or let's put it this way: I didn't know what his trouble was at that time, but I didn't see how passing a needle into the paravertebral region could possibly have produced the extensive neurological loss the patient had.
   *       *       *       *       *
   "A. * * * Would you like to know actually what I did find?
   "Q. Yes, sir, I would. A. The chief findings were weakness and atrophy of the muscles of the legs, meaning the legs from the knees down; some weakness of the muscles between the hips and the

knees, the muscles of the thighs. There was some weakness of the ability to flex and extend the hips. The knee jerks were still present and were active and equal. There were no ankle jerks and no reflexes obtained from the stroking the sole of the foot on either side.
   "In the sensory examination pin stick was completely absent throughout the backs of the thighs, the back of the calf, the lateral border of the foot, and in the saddle area, the saddle area, of course, is the seat, the surfaces of both buttocks. Those areas are supplied by the fifth lumbar and all of the five sacral nerves, and the absence of pin prick was present on both sides.
   "Although sensory examination showed complete absence in those areas, the muscles supplied by those nerves were only partially paralyzed at the time I saw him.
   "The conclusion to be drawn from the examination is that the patient was suffering from impairment of all the nerve elements below the first lumbar vertebra inside the spinal canal. At that time I was uncertain as to the cause—and still am."

10. Dr. Manchester defined a laminectomy as follows:
   "A laminectomy is the—you recall I showed you the vertebrae as a body, and at the back of that vertebra there is an arch made up of a pedicle, and then the upper portion is called the lamina.
   "Now, if one were to cut into the skin, get down to the muscle, separate the muscle, free it and excise the lamina, excise that, excise that arch, then you can get into the subarachnoid space, open it up, aspirate, suck up the blood, wash out with saline, inject a little hydro-cortisone or some other similar steroid, reduce the inflammatory reaction * * *."

patient himself, but that is a far cry from evidence that failure to perform constituted conduct below the standard of medical care in the community.

The judgment will be reversed and the cause remanded with directions to proceed in accordance with the opinion of this court.