CAPRICORN POWER COMPANY, INC., Capricorn Power Partners, L.P., CE Colver I, Inc., CE Colver Limited Partnership, Inter–Power of Pennsylvania, Inc., and Inter–Power Resource Partners, L.P. trading as Inter–Power/Ahlcon Partners, L.P., Plaintiffs,

v.

SIEMENS WESTINGHOUSE POWER CORPORATION, Defendant.

Civil Action No. 01–39J.

United States District Court, W.D. Pennsylvania.

July 2, 2004.

Bruce E. Stanley, Arthur H. Stroyd, Michael G. Connelly, Pittsburgh, PA, for plaintiffs.

Frederick W. Bode, III, Steven W. Zoffer, Lisa M. Tumolo, Dickie, McCamey & Chilcote, Pittsburgh, PA, for defendant.

### MEMORANDUM OPINION and ORDER OF COURT

GIBSON, District Judge.

#### SYNOPSIS

This case comes before the Court on the Defendant's Motion for Summary Judgment Pertaining to Plaintiffs' Remaining Claims. The Defendant's Motion is granted in part and denied in part.

Certain issues were previously submitted to the Court by way of a motion for summary judgment which was granted in part and denied in part by a Memorandum and Order of Court dated January 9, 2004. The Court will not repeat the background information set forth in the January 9th Memorandum and directs the reader to that Memorandum for an understanding of the background facts. Although, it must be added that during the January 2004 trial of this matter, a mistrial was declared. The basis of the mistrial con-

cerned the Plaintiffs' failure to produce a report dated June 23, 2000 that was prepared by consultants at CTC Corporation, and an accompanying report dated July 19, 2000 prepared by Dr. LeMay and Dr. Bagnall regarding the failure of the blower blades in the generator at the Colver Power Plant. The Court granted a mistrial on the basis that the non-production of these reports was prejudicial to the Defendant in prosecuting a defense of the Plaintiffs' action.

The Defendant, consistent with local rule 56.1, has submitted a second Statement of Undisputed Material Facts relevant to the Defendant's Second Motion for Summary Judgment. The undisputed facts are as follows: Plaintiffs are the owners, partners and/or joint ventures that operate the Colver Power Plant. Defendant's Undisputed Statement# 1. Inter–Power/Ahlcon Partners, L.P. was organized in June 1992 pursuant to a partnership agreement between Capricorn Power Company, Inc., CE Colver I, Inc. and Inter–Power of Pennsylvania, Inc. as general partners and Capricorn Power Partners, L.P., Inter–Power Resource Partners, L.P. and CE Colver Limited Partnership as limited partners. Defendant's Undisputed Statement # 2. Defendant, Siemens Westinghouse Power Corporation (hereinafter "Defendant"), is the successor in interest to the Power Generation Business Unit of Westinghouse Electric Corporation. Defendant's Undisputed Statement# 3. Other than these three facts, all other facts material to this summary judgment motion are in dispute.

### ANALYSIS

### ECONOMIC LOSS DOCTRINE ANALYSIS OF THE JANUARY 9, 2004 OPINION

Before proceeding to the Defendant's argument in support of its second motion for summary judgment, the Court will first address its analysis of the economic loss doctrine from its Memorandum Opinion dated January 9, 2004 because of the now enlarged perspective the Court possesses on this issue as a result of the previous mistrial in this matter. To ensure that our previous analysis is correct and updated based upon the revelation of Dr. Bagnall's consultant report that was the basis for the granting of the Defendant's motion for mistrial, we will re-visit our previous analysis of this issue beginning with a condensed review of the applicable case law.

The leading case in Pennsylvania on the subject of the economic loss doctrine is *REM Coal Company v. Clark Equipment Company, et al.*, 386 Pa.Super. 401, 563 A.2d 128 (1989) The Superior Court in the *REM Coal* opinion adopted the current version of the economic loss rule utilized in Pennsylvania from the rule found in *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) which focuses upon "the actual harm for which the plaintiff seeks recovery" and "not on the type of risk" posed by the product. *REM Coal*, p. 133. In *East River Steamship Corp. v. Transamerica Delaval, Inc.*, the Supreme Court adopted the economic loss doctrine in the context of admiralty actions and concluded that the realms of tort and contract must remain distinct and to preserve that distinction, tort recovery for a defective product should not be permitted where there is no damage to "other property" or personal injury. *East River* at 2302, 870–871. The ruling in *REM Coal* specifically adopted an approach that allows recovery in negligence and strict liability, in a civil action among commercial enterprises, if the bargained for product causes personal injury or injury to property other than the defective product. *REM Coal* at 132–134. However, recovery in negligence and strict liability will not be allowed if the only injury that occurs is

injury to the bargained for product because the law governing breach of warranty would be the appropriate cause of action. *Id.*

*REM Coal's* companion case, *New York State Electric & Gas Corporation v. Westinghouse Electric Corporation,* 387 Pa.Super. 537, 564 A.2d 919 (1989) (hereinafter *"NYSEG"* in reference to the case name and "NYSEG" in reference to the specific party) also addressed the economic loss doctrine. In *NYSEG,* under factual circumstances that are similar to the case *sub judice,* Westinghouse informed NYSEG that its blower spacer on the turbine generator "should be inspected during the next scheduled shut down" and that "the seal on the blower spacer should be replaced." *NYSEG* at p. 922. This work was completed in January 1984 but Westinghouse requested an immediate reinspection of the blower spacer in April 1984. *Id.* This inspection revealed that there was an indication of "a possible inception of an early stage crack in the blower spacer flange." *Id.* The generator was taken off-line to repair the blower-spacer in accordance with a "specific purchase order" that contained warranties and limitations of liability. *Id.* NYSEG subsequently filed a civil action alleging, *inter alia,* negligence and strict liability, breach of contract and breach of warranty. Summary judgment was granted to the defendant on these counts and NYSEG appealed. The Superior Court concluded that NYSEG's argument that other property was damaged in that parts of the generator were damaged by defective parts in the same generator was meritless; the court considered the generator a "complete and integrated package" and thus no damage was visited upon "other property." *NYSEG* at p. 925.

More recently, the Supreme Court further clarified the limits of the economic loss doctrine found in *East River* in its opinion in *Saratoga Fishing Company v. J.M. Martinac & Company,* 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997). There the Supreme Court examined another admiralty issue that concerned the economic loss doctrine: whether equipment added to a vessel by its initial owner after its sale to that initial owner is considered part of the vessel itself after a subsequent sale of the vessel, or does the equipment remain "other property" so as to be excepted from the economic loss doctrine? Justice Breyer, writing for the Court, concluded that when equipment is added to a vessel and that vessel is subsequently sold, the subsequent sale does not prevent that added equipment from remaining "other property." As a result, the subsequent owner of the vessel could take action against those alleged liable (manufacturer and/or component part supplier) for the loss suffered as to the "equipment added after the initial sale, despite the presence of a resale by the Initial User." *Saratoga* at 884, 117 S.Ct. 1783, 1789, 138 L.Ed.2d 76, 85. *Saratoga* lends guidance to our analysis:

Respondents make two other important arguments. First, they say that our reasoning proves too much. They argue that, if a Subsequent User can recover for damage a defective manufactured product causes to property added by the Initial User, then a user might recover for damage a defective component causes the manufactured product, other than the component itself. Saratoga Fishing, for example, could recover the damage the defective hydraulic system caused to any other part of the ship. *But the lower courts, following East River, have held that it is not a component part, but the vessel—as placed in the stream of commerce by the manufacturer and its distributors—that is the "product" that itself caused the harm.* See *Shipco 2295, Inc. v. Avondale Shipyards, Inc.,* 825 F.2d 925, 928 (C.A.5

1987); see also, e.g., *National Union Fire Ins. Co. of Pittsburgh v. Pratt & Whitney Canada, Inc.*, 107 Nev. 535, 539–542, 815 P.2d 601, 604–605 (1991). As the Court said in *East River:*

" 'Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of "property damage" in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability.' " 476 U.S., at 867, 106 S.Ct., at 2300 (quoting *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 330 (Alaska 1981)).

Our holding here, however, does not affect this rule, for the relevant relations among initial users, manufacturers, and component suppliers are typically different from those at issue here. Initial users when they buy, typically depend upon, and likely seek warranties that depend upon, a manufacturer's primary business skill, namely, the assembly of workable product components into a marketable whole. *884 *King v. Hilton–Davis*, 855 F.2d 1047, 1052 (C.A.3 1988); *Shipco 2295, supra*, at 929; *National Union Fire Ins.*, supra, at 541, 815 P.2d, at 605. Moreover, manufacturers and component suppliers can allocate through contract potential liability for a manufactured product that does not work, thereby ensuring that component suppliers have appropriate incentives to prevent component defects that might destroy the product. *King*, supra, at 1054; cf. *Shipco 2295, supra*, at 930. There is no reason to think that initial users systematically control the manufactured product's quality or, as we have said, systematically allocate responsibility for user-added equipment, in similar ways. Regardless, the case law does suggest a distinction between the

components added to a product by a manufacturer before the product's sale to a user, e.g., *Airlift Int'l, Inc. v. McDonnell Douglas Corp.*, 685 F.2d 267 (C.A.9 1982); *King, supra; Shipco 2295, supra;* and those items added by a user to the manufactured product, e.g., *Nicor Supply Ships Assocs. v. General Motors Corp.*, 876 F.2d 501 (C.A.5 1989); and we would maintain that distinction.

*Saratoga*, at 883–884, 117 S.Ct. 1783, 1788, 138 L.Ed.2d 84–85 (emphasis added).

The Third Circuit in *2–J Corporation v. Tice*, 126 F.3d 539 (3rd Cir.1997) addressed the applicability of the economic loss doctrine in the context of Pennsylvania law. The facts of the case concerned a warehouse that was pre-manufactured by one defendant and assembled by another defendant for the benefit for the plaintiff. After expiration of the warranty provisions of the contract of sale, the warehouse collapsed damaging the contents housed within. The Pennsylvania Supreme Court had not considered the economic loss doctrine by the time the district court in *Tice* addressed the merits of the case. However, the district court granted summary judgment for Jewell, the manufacturer, concluding that the Pennsylvania Supreme Court would interpret the economic loss doctrine to preclude recovery for damages incurred when a product fails "to perform as expected." *Tice* at 540–541. The Third Circuit disagreed concluding that the damaged property was "other property" and not part of the "product itself" in that it was foreseeable that the inventory would be damaged when the pre-manufactured warehouse collapsed just as it was foreseeable that the equipment added to the vessel in *Saratoga* would be damaged if the vessel was destroyed. *Tice* at 544. Thus, the Third Circuit concluded that the Pennsylvania Supreme Court would follow the reasoning found in *East River and Saratoga. Id.*

A year later, in *Sea–Land Service v. General Electric Company*, 134 F.3d 149 (3rd Cir.1998), the Third Circuit addressed the economic loss doctrine again in the context of replacement parts and how a defective replacement part is to be considered under the doctrine. *Sea–Land* dealt with the question of "What is the product?" *Sea–Land* at 152. The factual circumstances of the case were that a connecting rod was defective and damaged the diesel engine to which it was attached. The Plaintiff alleged that the connecting rod was the product and the engine and its casing were other property, thereby permitting the suit to survive summary judgment despite the application of the economic loss doctrine. The Plaintiff's argument was based upon the premise that there were two contracts involved in the history of the failed engine. First, the contract to purchase the used engine and second, the contract to purchase the connecting rod which turned out to be defective and destroyed the engine and its casing. However, the connecting rod was a replacement part, expected to be replaced even at the time of the engine's initial sale. The Third Circuit followed the "integrated product rule" in finding that since commercial parties are aware of the need for replacement parts for machinery of this type and therefore, the product originally bargained for includes replacement parts within such a bargain, replacement parts are part of the original product; accordingly, the engine and casing cannot be "other property" with regard to the connecting rod. See *Sea–Land* at 154.

On the question of which party was responsible for the failure of a component part, the Third Circuit in the case of *King v. Hilton–Davis*, 855 F.2d 1047 (3rd Cir. 1988) held that Pennsylvania law concerning the economic loss doctrine would only permit recovery from a manufacturer of a completed product, and not a manufacturer of component part integrated into the completed product, when a component part's defect resulted in the product's failure.

In addition, it has been found by the Pennsylvania Superior Court that the economic loss doctrine is not restricted only to disputes between commercial enterprises but is also applicable to the tort remedies sought by individuals against manufacturers of defective products. *Jones v. General Motors Corporation*, 428 Pa.Super. 544, 631 A.2d 665 (1993).

■ With this background in mind, we wish to revisit our January 2004 decision on the previous motion for summary judgment to clarify and expand that analysis. The Court would not revisit this analysis absent circumstances that permit us to reconsider a matter that is the law of the case. However, reconsideration of this issue is deemed to be appropriate due to the fact that 1) the Defendant was granted a mistrial based upon evidence not previously produced by the Plaintiffs prior to the first trial; and 2) that this evidence, which is relevant to the root cause of the generator failure, may prove the Court's previous summary judgment analysis erroneous if true. Therefore, the Court must clarify and expand upon its analysis of January 2004 in order to properly take into account the "new evidence" that is the consultant's report from Dr. Bagnall and its suggestion of an alternative theory that the failure of the integrity of the stiffeners and end box diffuser, and not a defect within the blades, resulted in the generator failure. We must also address this issue again as it would be erroneous to continue under the same analysis developed before the trial in January 2004 as such analysis did not consider the alternative theory that the origination of the generator failure was within the stiffeners and the end box and not the re-designed blades. Our reconsideration of the previous decision is permitted under

the law of the case doctrine because of the availability of "new evidence" [1] and the fact that our previous decision would be clearly erroneous under existing case law with regard to the economic loss doctrine and the other property exception to that doctrine thereby causing manifest injustice to the Defendant. *See In Re: City of Philadelphia Litigation*, 158 F.3d 711 (3rd Cir. 1998). It is these two bases that have prompted review of our previous opinion, but the following analysis is made primarily in order to correct our previous ruling which would otherwise be in clear error resulting in manifest injustice.

In the case *sub judice*, the parties argue that there exist different causes of the generator failure of December 29, 1999. Specifically, the Plaintiffs intend to offer evidence that the failure of the generator resulted from one of the twenty-four turbine blades which were of a defective design. Experts for the Plaintiff have opined as such. The Defendant posits an opposite theory of causation, namely that there was a defect within the stiffeners and end box that resulted in the movement of the end box which in turn caused movement of the shroud surrounding the turbine blades thereby causing an impact of the shroud upon the turbine blades.

In the Court's opinion of January 9, 2004, it was determined that the economic loss doctrine, although applicable to the instant facts, did not result in dismissal of the Plaintiff's tort claims because of the applicability of the "other property" excep-

tion to the economic loss doctrine. The "other property" exception essentially prevents the dismissal of tort claims under the economic loss doctrine when a defective product causes personal injury or damage to property other than the defective product itself; in turn, only recovery as to the personal injuries and/or other property damage is permitted. *REM Coal Company v. Clark Equipment Company, et al.*, 386 Pa.Super. 401, 563 A.2d 128, 130–131 (1989) Therefore, it is clear under the economic loss doctrine that recovery in negligence and strict liability will not be permitted if the defective product causes damages only to itself; the proper method of recovery in such a situation is a cause of action based upon a contract and/or breach of warranty theory pursuant to the terms of the purchase contract for the defective product. *See REM Coal Company v. Clark Equipment Company, et al.*, 386 Pa.Super. 401, 563 A.2d 128 (1989); *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). If the defective product only damages itself, the only loss that is present is economic loss. *Id.*

Our opinion of January 9, 2004 permitted the Plaintiffs to survive summary judgment as to their causes of action sounding in tort based upon the "other property" exception. However, our opinion did not clearly state, but only implied, the limits of the Plaintiffs' recovery of damages in tort, i.e. damage to the other property. In addition, our opinion from January 9, 2004

---

1. We understand that the Plaintiffs would argue the position that the "new evidence" had been explored and discussed by both of the parties in their research of the generator failure. However, not until the present summary judgment motion has the Defendant offered the alternative theory as a reason for the Court to grant judgment on its behalf. Failure to consider this within our analysis of the economic loss doctrine would certainly render our analysis incomplete, thereby errone-

ous. The analysis of the gist of the action doctrine set forth in our Memorandum of January 9, 2004 is not affected by the "new evidence" because the Court had reserved judgment on that issue pending the jury's determination of whether the master work agreement or one of the other contracts was intended by the parties to apply to the work conducted by the Defendant with regard to the design and placement of the re-designed blades within the generator.

implied, but did not clearly state, what we had considered to be other property, thus permitting application of the "other property" exception. Our opinion simply framed the issue as follows:

> The argument concerning the applicability of the economic loss doctrine in the case *sub judice* concerns whether "other property" was damaged as a result of the December 29, 1999 blades failure. The Plaintiffs contend that "other property" was damaged in that the WESTAC generator was damaged in addition to the replacement blades within the generator's turbine. The Defendant argues that the replacement blades are a part of the integrated unit that is the generator.

Memorandum Opinion of January 9, 2004, pp. 18–19 (Document # 94).

It is clear from our previous analysis that the re-designed blades are not replacement blades in the sense that the original blades were intended to be replaced periodically as part of routine maintenance of the generator.[2] This fact supported our prior conclusion that the generator was other property, however, we failed to analyze the re-designed blades status as a component part of the generator.

In *East River*, the Supreme Court touched upon the role component parts play in the "other property" exception to the economic loss doctrine:

> "In the traditional 'property damage' cases, the defective product damages other property. In this case, there was no damage to 'other' property. Rather, the first, second, and third counts allege that each supertanker's defectively designed turbine components damaged only the turbine itself. Since each turbine was supplied by Delaval as an intergrated package, see App. 162–163, each is properly regarded as a single unit. 'Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability.' *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 330 (Alaska 1981)."

*East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 867, 106 S.Ct. 2295, 2300, 90 L.Ed.2d 865, 874 (1986). *Saratoga, infra,* supports this view in its holding that the "product" is considered to be that item which the manufacturer supplied and not one of the separate items of component parts supplied by the various component parts manufacturers. If the new re-designed blades are considered component parts of the generator in that the re-designed blades were considered part of the object of the bargain,[3] then the resulting damages to the rest of the generator will not be damages to other property, thereby resulting in summary judgment in favor of the Defendant.

---

2. From a review of the documents of record the Court did not find any evidence that Defendant intended the original blades to be parts which were to be replaced at specific intervals based upon usage wear. Clearly, no notice of such a replacement requirement was given to Plaintiffs regarding the original blades.

3. The "object of the bargain" test is the test applied by the Third Circuit in economic loss doctrine analysis and was applied specifically in the case of *Sea–Land Service v. General Electric Company*, 134 F.3d 149 (3rd Cir. 1998), as it was found to be consistent with the rulings of the Supreme Court in *East River* and *Saratoga* in that it defines what was considered to be the product versus other property. The Court will thus refer to the "object of the bargain" test in making our analysis.

What has been critical in the leading cases discussing the economic loss doctrine and the other property exception has been the manner in which the "product" is defined. It has been settled that the product is that item which was supplied by the manufacturer without regard to the source of the component parts. *Saratoga, infra.*

It can be argued that the product in the case *sub judice* can be either the WESTAC generator or the re-designed blades in that the re-designed blades were designed and supplied after the generator was sold to the Plaintiffs, and in the record it is undisputed that the re-designed blades were not replacement parts in the sense that the blower blades were intended to be replaced periodically as a part of regular maintenance of the generator. There is also no issue akin to the one in *King, supra,* as to whether the component manufacturer or the manufacturer of the completed product is responsible because in this case the Defendant was the manufacturer of the generator, including the original blades, and the re-designed blades.

With these issues established, the question that must be asked next is whether the re-designed blades would be considered a component part so as to be integrated with the generator and not create an "other property" exception by their addition to the generator. Specifically, the issue is whether the re-designed blades can be considered part of the object of the bargain for the generator. This issue parallels a previous issue that was analyzed in our first opinion disposing of the Defendant's first motion for summary judgment where we determined that it is a question of fact for the jury to determine whether the work performed by the Defendant in placing the re-designed blades into the generator was an action that was performed under the warranty provisions of the applicable contracts between the Plain-

tiffs and Bechtel and the subcontractor contract between Bechtel and the Defendant. Since the parties continue to dispute whether the re-designed blades were a part of the object of the bargain and therefore covered by the various warranty, disclaimers of damages and disclaimers of liability provisions that have been raised by the Defendant as defenses, this question of fact is properly within the province of a jury.

In the event a jury should determine that the re-designed blades were indeed part of the object of the bargain, the Defendant's above-referenced defenses would certainly apply to prevent recovery by the Plaintiffs. However, the Plaintiffs' position is that should a jury determine that the re-designed blades were not an object of the bargain and were in fact the subject of a sales contract or even some gratuitous actions by the Defendant separate and apart from the sale of the generator, then this finding would result in the re-designed blades, which the Plaintiffs are claiming are defective, being labeled as the defective "product" with the generator thereby becoming the "other property." In order for this conclusion to be accepted the Court would have to accept a reversal of roles for the generator and the re-designed blades from the roles these two objects would normally fill in the appellate cases dealing with the economic loss doctrine and the "other property" exception. However, the Court rejects this reversal of roles as erroneous reasoning. Under the theory that the re-designed blades were a part of the integrated package of the generator and thereby covered under the applications of warranties and disclaimers of damages found in the contracts at issue as well as the application of the economic loss doctrine, the generator is the product in which the blades would be integrated, rather than the generator being other property which is integrated into the re-

designed blades. This is so because it is the generator that has been sold by the Defendant to Bechtel and in turn sold by Bechtel to the Plaintiffs that is the product and the blades are component parts of the product sold under the applicable contracts.

Clearly, the argument that the blades are the product and the generator is other property, is not plausible. It is not plausible because this argument reverses the clear factual circumstances of this case under which the generator is the *product* that was sold by the manufacturer. To argue that the re-designed blades are not *other property* but are the *product* is to make an assumption that is contrary to the undisputed facts in this case and is an impermissible manipulation of the facts and a contortion of applicable case law so as to apply the economic loss doctrine to the Plaintiffs' advantage. To flesh out the Plaintiffs' theory further: If the jury were to find that the re-designed blades were not an object of the bargain for the generator, implied in such a finding is that the generator is the product which the Defendant has placed on the market. It naturally follows that the subsequently acquired re-designed blades would be relegated to the classification of *other property*. *Sea-Land* supports this view in the following quote: "We conclude then that every component that was the benefit of the bargain should be integrated into the *product;* consequently, there is no 'other property.' However, we distinguish from the *product* additional parts that are not encompassed in the original bargain but are subsequently acquired. These should not be integrated." *Sea-Land Service v. General Electric Company*, 134 F.3d 149, 153 (3rd Cir. 1998) (emphasis in the original). In such a scenario, the re-designed blades must be the other property in that they were added to the generator and not considered a part of the integrated generator package sold by the Defendant. *Saratoga* provides fur-

ther instruction on this point as it defined the product as that item which the manufacturer had sold. The *Saratoga* Court framed the issues and conclusions in the case before it as follows:

> Does the term 'other property,' as used in that case, include equipment added by the Initial User before he sold the ship to the Subsequent User? We conclude that it does: *when a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the "product itself" under East River. Items added to the product by the Initial User are therefore 'other property,'* and the Initial User's sale of the product to a Subsequent User does not change these characterizations.

*Saratoga Fishing Company v. J.M. Martinac & Company*, 520 U.S. 875, 879, 117 S.Ct. 1783, 1786, 138 L.Ed.2d 76, 82 (1997) (emphasis added).

The Court recognizes that *Saratoga* concerned the issue of what was considered the product in the context of a resale of the product after certain items had been added to that product. The Court also recognizes that the property added to the vessel in *Saratoga* was not necessary for it to function as a ship, but was added for the purpose of allowing the ship to be used for the specific purpose of tuna fishing. *Saratoga*, 520 U.S. 875, 887, 117 S.Ct. 1783, 1790, 138 L.Ed.2d 76, 87 (1997) (Scalia, J., dissenting).

■ The re-designed blades or more aptly stated, blades of any type, were necessary for the functioning of the generator. But our reading of the case law finds that the line between what is part of the integrated product and what is other property is defined by what is the "object of the bargain" not by what part is necessary for the operation of the product as designed and produced by the manufacturer. This leads us back to our analysis of what is

considered the *product* versus *other property*. Since the record is clear that the generator was the product sold by the Defendant to Bechtel and subsequently to the Plaintiffs, the issue is whether the re-designed blades are part of the integrated package or are they other property. Under the factual circumstances of this case, the re-designed blades cannot be found to have ever been the product which was defective and caused damage to other property, i.e. the generator. Therefore, left with these possible characterizations of the re-designed blades, the resultant legal consequences are these: 1) if the re-designed blades are part of the generator so as to be considered part of the object of the bargain and thus subject to the warranty provisions, limitations of damages and the economic loss doctrine, summary judgment must be granted in favor of the Defendant; or 2) if the re-designed blades are considered other property (because the generator fulfills the role of the "product") and the Plaintiffs' experts have opined that the re-designed blades are defective and caused the generator failure, summary judgment must be entered for the Defendant because other property cannot also be the defective product under the "other property" exception to the economic loss doctrine. As a result, in either scenario, summary judgment must be granted for the Defendant on the causes of action of negligence, negligent misrepresentation, and malfunction. Because our Memorandum Opinion of January 9, 2004 was erroneous to the extent that the Court implied that the generator was other property and the re-designed blades were the product, it is hereby overruled. Defendant's summary judgment motion is granted with regard to Plaintiffs' causes of action, of negligence, negligent misrepresentation and malfunction.

█ The Court feels it necessary to briefly address the status of the fraud count plead by the Plaintiffs in their amended complaint. Having researched the issue of the application of the economic loss doctrine to the tort of fraud, the leading case on the issue, in the absence of Pennsylvania law on this subject, is the Third Circuit decision in *Werwinski v. Ford Motor Company,* 286 F.3d 661 (3rd Cir.2002). In that opinion the Third Circuit predicted that Pennsylvania would determine that the economic loss doctrine applies to the intentional tort of fraud if the fraud does not arise independent of the "underlying contract." *Werwinski,* at 676–681. The Third Circuit's in depth analysis of the doctrine's application upheld the district court's finding that an exception for intentional fraud should not be found within the economic loss doctrine, where the Plaintiffs alleged fraudulent concealment of defective automotive parts in vehicles manufactured by Ford. In coming to this conclusion, the Third Circuit essentially agreed with the court in *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich.App. 365, 373, 532 N.W.2d 541, 545 (1995) which found an exception for fraud-in-the-inducement claims to the economic loss doctrine so long the "fraud is 'extraneous to the contract,' not 'interwoven with the breach of contract.'" *Werwinski* at 676.

Such a conclusion makes sense in the overall purpose of the economic loss doctrine. If the doctrine is to separate the spheres of contract law and tort law, the absence of a contract or contractual provision intended to address the factual circumstances that give rise to the intentional fraud claim would eliminate the rationale for application of the economic loss doctrine. That is to say, where no contract was formed to provide a remedy for the damages being claimed in a tort action, there is no corresponding need to apply the economic loss doctrine to prevent the contract remedies from being superseded by tort remedies. Therefore, the Court views the Plaintiffs' fraud claim as a mat-

ter resting upon the conclusions to be reached by a jury. The Plaintiffs' fraud claim factually relates to the blower blade program established by the Defendant to study the re-design of the blades in addition to the specific allegations by the Plaintiffs that the Defendant intentionally failed to inform the Plaintiffs that the re-designed blades were an "interim" design and permitted the Plaintiffs to utilize these blades for a period of approximately a year and a half while knowing that the expected life-span of the blades was shorter than the remaining life-span of the generator. Should the jury determine, just as with the other issues discussed above, that the re-designed blades were in fact covered under the contract between the Plaintiffs and Bechtel and the Bechtel subcontractor contract between itself and the Defendant, the Plaintiffs' fraud claim will also be barred by the economic loss doctrine. This is the result because the Court would consider the re-designed blades and the program begun to create the blades and monitor their success to be so intertwined with the contracts' provisions that the fraud claim, which relates to the re-designed blades and their quality, condition and life-span, would fall within the parameters of the economic loss doctrine.

However, should a jury decide that the re-designed blades were made and placed into the generator separate and apart from any requirements under the Plaintiffs–Bechtel and Bechtel–Defendant contracts and thus were not an object of the bargain entered into by the various parties for the construction of the power plant, the Plaintiffs' fraud claim would not be subject to the economic loss doctrine in that the subject matter of the claim would be collateral to the above-mentioned contracts. As a result, the Plaintiffs could pursue the damages claimed under the fraud count, including the alleged punitive damages.[4]

## DEFENDANT'S REMAINING ARGUMENTS FOR SUMMARY JUDGMENT

■ The Court will now address the Defendant's remaining arguments for summary judgment. With only three material facts not being in dispute, it is the Court's duty to deny the motion for summary judgment as to certain arguments of the Defendant. This is particularly so because of the fact that the Defendant's motion with regard to 1) the end box diffuser and stiffeners were included within the purchase by the Plaintiffs of the generator in accordance with contracts that preclude the Plaintiffs' action and limit their remedies, and 2) the gist of the action doctrine, depends for success upon the "fact" that the failure of the generator has its basis in the failure of the end box diffuser and stiffeners.[5] On the other hand, the Plain-

---

4. The parties indicated at the time of oral argument on the present summary judgment motion, in response to an inquiry from the Court, that it is still in dispute between the parties as to whether the Master Work Agreement between the Plaintiffs and Defendant applies to the work performed by the Defendants in placing the re-designed blades into the generator in April 1998. The Master Work Agreement has similar provisions for the application of limitation of warranties and disclaimers of damages resulting from work performed under it as can be found under the Plaintiff–Bechtel and Bechtel–Defendant contracts. However, in consideration of the fact that the Master Work Agreement did not relate to the sale of the generator, it has not been discussed in the economic loss doctrine analysis set forth above.

5. The Defendant also moved for summary judgment on the basis of the economic loss doctrine. With regard to that issue, the Court determined above that a re-examination of the economic loss doctrine analysis originally set forth in the Memorandum and Order of January 9, 2004 was necessary. Since Court has determined summary judgment is appropriate for the counts of negligence, negligent misrepresentation and malfunction based upon our re-examination, *supra*, we need not address the Defendant's arguments in its second motion for summary judgment based upon the economic loss doctrine.

tiffs are offering an opposite theory, the same theory they put forth in the first trial on this matter, that the blower blades themselves are defective and therefore the root cause of the generator failure. This crucial fact regarding causation remains in dispute and is a matter for the jury.

The Defendant's argument that the Plaintiffs' experts, Drs. LeMay and Bagnall, who were consultants at the time they proffered a possible theory for the generator failure, are somehow now precluded from offering their expert opinions that differ from their initial theories is not accepted by this Court. The Court cannot sanction such a view of consultant reports because it would lead to the foreclosure of any further experimentation or analysis on the part of experts that were previously hired as consultants. Drs. Bagnall and LeMay have authored expert reports that will be offered by the Plaintiffs in the trial of this matter and those expert reports contain the conclusions these doctors reached after they completed their analyses. The Defendant is free to cross-examine the Plaintiffs' experts in regard to their consultant reports and the differences between the expert reports and their consultant reports. This cross-examination will provide an adequate opportunity for Defendant to confront any inconsistencies the Defendant believes exists between the two reports. However, the fact that Drs. LeMay and Bagnall had opinions in the beginning of their consultant investigations that differ from the analysis and conclusions found in their respective expert reports is not a basis upon which to find that the original opinions foreclose any possible further analysis and different conclusions and thereby create an undisputable fact upon which summary judgment must be granted. The jury will determine the facts as they relate to the cause of the generator failure at the Colver Power Plant. The Defendant's argument would be successful if the Plaintiffs' experts had concluded within their expert reports that the end box diffuser and the stiffeners were indeed the cause of the generator failure rather than the blower blades being the cause of such failure. In such a circumstance, the experts for all parties would be in agreement, thus establishing an undisputed material fact. Therefore, summary judgment is denied with regard to the arguments set forth in 1) and 2) above.

There are two arguments for summary judgment set forth by the Defendant which are not dependent upon their theory that the defective end box diffuser and stiffeners caused the generator failure: 1) the testimony of the Plaintiffs' experts is insufficient as a matter of law to sustain plaintiffs' burden of proof on the issue of causation; and 2) raised at oral argument, that paragraphs 7.2 (Waiver of Consequential Damages), and 7.3 (Application of Limitations) of the First Amended and Restated Contract between the Plaintiffs and Bechtel Power Corporation (hereinafter "Bechtel") and paragraphs 22.1 and 22.2 of the purchase contract and amendment between Bechtel and the Defendant for the purchase of the subject generator preclude recovery by Plaintiffs.

With regard to the first argument, the Defendant argues that the inconsistency between the consultant reports and the expert reports of Drs. LeMay and Bagnall requires entry of summary judgment citing to the case of *Dill v. Scuka*, 279 F.2d 145 (3rd Cir.1960) for the principle that conflicting expert testimony on material facts will not carry the offering party's burden of proof at trial. *Dill* cited to the Pennsylvania Supreme Court case of *Mudano v. Philadelphia Rapid Transit Co.*, 289 Pa. 51, 61, 137 A. 104, 107–108 using the following excerpt:

> Moreover, we do not mean, by anything said in this opinion, to intimate that, whenever a litigant calls experts and

they disagree, this necessarily destroys his case on the particular point of disagreement; what we do mean is that, when plaintiff has the burden of proof on an issue of fact which goes to the essence of any material part of his case, and he selects scientific experts to speak for him, because the point at issue can be solved only in that way, such experts are peculiarly his mouthpiece—they take his place and, so far as the rule laid down in the line of cases first mentioned in this opinion is concerned, may be viewed as though they collective were the plaintiff himself. If, after being equally accredited by plaintiff, witnesses of the character just described so vitally disagree on essential points as to neutralize each other's opinion evidence, their sponsor has not borne the burden of proof which the law casts upon him, and to that extent has failed to make out his case—though, in our opinion, minor points of difference between such witnesses should not be thus viewed.

*Mudano v. Philadelphia Rapid Transit Co.*, 289 Pa. 51, 61, 137 A. 104, 107 (Pa. 1927). While the Court agrees with the Defendant that the Plaintiffs may not offer expert testimony on essential points that is contradictory to the extent set forth in *Mudano* and *Dill* and expect to meet their burden of proof, the Court finds a distinction between *Dill* and the case *sub judice*. *Dill* concerned a motion for involuntary dismissal under F.R.Civ.P. 41(b) after trial testimony had been taken from the experts and it was determined the inconsistency between the experts proved fatal to the plaintiff's proof of his medical malpractice claim. The Third Circuit disagreed on the presence of an inconsistency and reversed the district court's dismissal and remanded the matter.

In the case *sub judice*, the Defendant is arguing that an inconsistency between con-

sultants' reports and later experts' reports, drafted by the same two experts demonstrates a vital inconsistency that requires entry of summary judgment in that the Plaintiffs are in effect speculating as to the cause of the generator failure. This is not an observation with which the Court can agree. As stated above, the Court cannot foresee holding every consultant to his/her initial theories when they are subsequently hired to be an expert and conduct further investigation and reach conclusions which are different from their preliminary conclusions. In addition, none of the experts have provided trial testimony in this matter. Drs. LeMay and Bagnall have only testified at a *Daubert* hearing conducted as a corollary to the trial testimony. The doctors' *Daubert* testimony was consistent with their final conclusions and consistent with each other's testimony. This matter has not reached the point that was reached in *Dill* where the trial court had to determine if an inconsistency on essential points existed among expert trial testimony so as to require involuntary dismissal. The Defendant's Motion for Summary Judgment based upon this argument is therefore denied.

In regard to the second argument, the applicability of the limitations of remedy and liability provisions between the prime contract and the subcontract, the Court concludes that summary judgment is granted in part and denied in part in accordance with the following analysis.

Paragraphs 7.2, 7.3, 22.1–22.3 are produced here in their entirety:

7.2 [6] *Waiver of Consequential Damages.* Except for Contractor's obligation to make Late Payments, Buydown Payments and 67% Capacity Deficiency Payments, and except for the obligation of either party to pay incidental damages to the extent expressly described in

---

**6.** In paragraphs 7.2–7.3, "Owner" is the Plaintiffs and "Contractor" is Bechtel.

Section 2.21 or Section 9 hereof, Owner and Contractor waive any rights as against each other for special, indirect, incidental and consequential damages as suffered by either of them including, without limitation, lost profits or revenues, and each party hereby releases the other party from any such liability. Owner's waiver of certain rights as against the Contractor as set forth in this Section 7.2 shall also constitute a waiver of such rights as against Subcontractors.

7.3 *Application of Limitations.* The releases, limitations of liability, limitations of remedy and benefits of the indemnities expressed in this Contract shall apply regardless of whether the liability, remedy or subject of indemnity arises out of contract, tort (including negligence), strict liability or otherwise, and shall extend to the affiliated companies or entities, shareholders, directors, officers, employees and agents of the party to the benefit of which such provisions operate, and in the case of Owner, to all entities comprising the Owner, their respective affiliates, and the shareholders, directors, officers, employees and agents of any of the foregoing. Notwithstanding the foregoing, the releases, limitations of liability, limitations of remedy and benefits of the indemnities expressed in this Contract shall not apply to matters unrelated to this Contract or outside the scope of Work to be performed hereunder, or to other agreements between or among the parties hereto or any agreements between or among any of the companies that comprise them or the affiliates, entities, shareholders, directors, officers, employees or agents of any of them.

22.1 [7] Except for SELLER'S indemnification obligations with regard to INFRINGEMENT as set forth in GC–9 and INDEMNIFICATION as set forth in GC–17, the total liability of the SELLER under this AGREEMENT whether based in contract, liquidated damages, warranty, tort (including negligence), strict liability, or otherwise, arising out of the performance of this AGREEMENT or from the manufacture, sale, delivery, resale, repair, installation, technical direction of installation, replacement or use of any equipment shall not exceed an amount equal to the Total Purchase Order Price as such price may be adjusted. All liability of SELLER under this AGREEMENT shall terminate seventy (70) months from the final delivery of all major Steam Turbine Generator components; provided any claims for indemnity pursuant to clause (I) of General Condition GC–17 may be asserted up to three (3) years following the occurrence of any injury upon which such a claim is predicated and provided further that SELLER'S obligations of confidentiality will continue as provided in General Condition GC–19.

22.2 In no event, whether as a result of breach of contract, warranty, tort (including negligence), strict liability, or otherwise, shall SELLER or its subcontractors or suppliers be liable for: loss of profits or revenues; loss of use of the equipment or any associated equipment; cost of capital; cost of substitute equipment or services (except to the extent specifically allowed in General Conditions GC–8, GC–9, GC–14, GC–17 and GC–18); cost of

---

7. In paragraphs 22.1–22.3, "SELLER" is the Defendant, "BUYER" is Bechtel and "OWNER" is the Plaintiffs.

substitute facilities; replacement or purchased power; downtime costs; claims of BUYER'S customer's; or for any special, consequential, incidental, indirect or exemplary damages (except to the extent that the obligations expressly and specifically assumed by SELLER pursuant to General Conditions GC–8, GC–9, GC–14, GC–17 and GC–18 may be deemed to be consequential, incidental, or indirect damages). The foregoing shall not preclude nor limit SELLER'S obligations to pay liquidated damages under this AGREEMENT and, with respect to General Condition GC–17, "consequential, incidental" or "indirect" damages shall not be deemed to include the indemnity and defense obligations for injury or death to persons, or direct physical damage to property of third parties.

22.3 The limitations of liability, limitations of remedy and benefits of the indemnities expressed in this AGREEMENT shall not apply to matters unrelated to this AGREEMENT or outside the scope of Work to be performed hereunder, or to other agreements between or among the parties hereto or any agreements between or among any of the companies that comprise them or the affiliates, entities, shareholders, directors, officers, employees or agents of any of them, and any damages or other amounts covered by any insurance required to be obtained by SELLER, BUYER or OWNER shall not be included for purposes of determining whether the Total Purchase Order Contract Price limitation on SELLER'S liability pursuant to subsection

22.1 of this AGREEMENT has been reached.

The Defendant at oral argument made the contention that paragraph 22.1 of the Bechtel–Defendant subcontract at a minimum precludes recovery for the Plaintiffs above the price of the generator.[8] The Defendant bases this argument upon the express language of that paragraph, specifically the "or" clause which reads:

the total liability of the SELLER under this AGREEMENT whether based in contract, liquidated damages, warranty, tort (including negligence), strict liability, or otherwise, arising out of the performance of this AGREEMENT *or from the manufacture, sale, delivery, resale, repair, installation, technical direction of installation, replacement or use of any equipment shall not exceed an amount equal to the Total Purchase Order Price as such price may be adjusted.*

Emphasis added. The Defendant argues that the replacement of the blower blades is contemplated with this language and the fact of replacement is not dependent upon the performance of the agreement but rather depends upon the fact that it was a replacement of equipment. Summary Judgment Transcript, (hereinafter "SJT") pp. 21–22. The Plaintiffs' response is that the separate provisions in the Bechtel–Defendant contract are inapplicable to the Plaintiffs as the Plaintiffs had a prime contract separate and apart from the Defendant's subcontract. SJT pp. 25–26.

The following definitions will guide us in our evaluation of the interplay between the two contracts:

Subcontract.

A subcontract is a contract under, or subordinate to, another contract.

---

8. The total purchase order price as stated in the original agreement between Bechtel and the Defendant was $12,984,540.00. After four amendments, the revised price is now $13,229,000.00.

Contractor.

A contractor is one who undertakes to, or offers to undertake to submit a bid to construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building. He or she is ordinarily understood to be a person who undertakes to supply labor and materials for specific improvement under a contract with the owner. In the law of building contracts, a contractor is one who contracts or covenants, whether with the government or other public body or with private parties, to construct works or erect buildings, at a certain price or rate, such as a paving contractor.

General contractor.

A general contractor in a building contract sense is any person who contracts directly with the owner, the phrase not being limited to one undertaking to complete every part of the work.

Subcontractor.

A subcontractor has a well defined meaning in building contracts, is generally understood to be one who contracts to perform all or part of the work that another has already contracted to perform. According to some courts, a subcontractor does not include laborers or materialmen. However, other decisions have found that a materialman is a type of subcontractor, and is thus included within the term.

17 C.J.S. *Contracts* § 11 (footnotes omitted).

The Third Circuit summarized Pennsylvania law regarding the interpretation of contractual language as follows:

Of course, the goal of contract interpretation is to discover the parties' objective mutual intent. Under Pennsylvania law " '[i]t is firmly settled that the intent of the parties to a written contract is contained in the writing itself.' " *Samuel Rappaport Family Partnership v. Meridian Bank*, 441 Pa.Super. 194,

657 A.2d 17, 21 (1995) (quoting *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 642–43 (1993)); *see also Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir.1994) ("Pennsylvania courts apply the 'plain meaning rule' of interpretation of contracts which assumes that the intent of the parties to an instrument is 'embodied in the writing itself ....' ") (citation omitted). Thus, where, as here, the parties have reduced their agreement to writing, Pennsylvania courts presume that the parties' mutual intent can be ascertained by examining the writing. Only where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual intent. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994). Therefore, as a preliminary matter, courts must " 'determin[e] as a matter of law which category written contract terms fall into—clear or ambiguous.' " *Id.* (citation omitted). There are, as we recently noted, two kinds of ambiguity, patent ambiguity and latent ambiguity: ' "[a] patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used." Black's Law Dictionary 105 (rev. 4th ed.1968). In contrast, a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous. *Easton v. Washington County Ins. Co.*, [391 Pa. 28] 137 A.2d 332 (1957).' *Allegheny*, 40 F.3d at 1424 (quoting *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 663 (1982)).

Because of Pennsylvania's presumption that the writing conveys the parties' intent, '[a] contract will be found ambig-

uous "if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." ' *Meridian Bank,* 657 A.2d at 21–22 (quoting *Krizovensky,* 624 A.2d at 642–43).

Pennsylvania law permits courts to examine certain forms of extrinsic evidence in determining whether a contract is ambiguous. But lest the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to determining "the parties' linguistic reference." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 n. 12 (3d Cir.1980). In other words, "extrinsic evidence may be utilized to demonstrate the existence of a latent ambiguity." *Meridian Bank,* 657 A.2d at 22 (citing *Lohmann v. Piczon,* 338 Pa.Super. 485, 487 A.2d 1386 (1985)). Thus, as we pointed out in Mellon Bank, when the contract refers to $10,000, unless we looked at extrinsic evidence we might never learn that the parties were referring to Canadian rather than American dollars. 619 F.2d at 1011 n. 12. In making the ambiguity determination, then, we " 'consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.' " *Hullett,* 38 F.3d at 111 (citation omitted).

*Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 613–614 (3rd Cir.1995).

It is a basic principle of contract law that when two or more writings are executed at the same time and involve the same transaction, they should be construed as a whole. *Von Lange v. Morrison–Knudsen Co., Inc.,* 460 F.Supp. 643 (M.D.Pa.1978), aff'd mem., 609 F.2d 504 (3d Cir.1979); *International Milling Co. v. Hachmeister, Inc.,* 380 Pa. 407, 110 A.2d 186 (1955). If the writings pertain to the same transaction, it does not matter that the parties to each writing are not the same.

*Black v. T.M. Landis, Inc.* 280 Pa.Super. 621, 625, 421 A.2d 1105, 1107 (Pa.Super., 1980).

Generally, all writings which are part of the same transaction are interpreted together. One application of this principle is the situation where the parties have expressed their intention to have one document's provision read into a separate document. So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned. It is not necessary to refer to or incorporate the entire document; if the parties so desire, they may incorporate a portion of the document. But incorporation by reference is ineffective to accomplish its intended purpose where the provisions to which reference is made do not have a reasonably clear and ascertainable meaning.

\* \* \*

While discussion of incorporation by reference is often framed in terms which suggest the complete absorption of one

document into another, it is important to note that where incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for such purpose only, and should be treated as irrelevant for all other purposes. Moreover, while it is often said that the two writings together form one contract, this is not always accurate, even though the several writings are part of the same bargain.

11 WILLISTON ON CONTRACTS § 30:25 (Richard A. Lord, ed., 4th ed.2003)(footnotes omitted).

■ With an understanding of this legal background, the Court must evaluate the interplay between the Plaintiffs–Bechtel prime contract (hereinafter "prime contract") and the Bechtel–Defendant subcontract (hereinafter "subcontract"). The prime contract as amended is dated February 15, 1993; the subcontract as amended is dated March 5, 1993. Paragraph 7.2 of the prime contract explicitly waives consequential damages between the Plaintiffs and Bechtel as well as between the Plaintiffs and the Defendant. Paragraph 7.3 makes this waiver applicable to any type of liability through use of the language: "shall apply regardless of whether the liability, remedy or subject of indemnity arises out of contract, tort (including negligence), strict liability or otherwise." Paragraphs 7.2 and 7.3 therefore work together to limit the Plaintiffs' claims of any consequential damages against the Defendant no matter what theory of liability is relied upon by the Plaintiffs to base their claim against the Defendant. The language of these provisions is clear and absolute and without any ambiguity. Although this language is a part of the prime contract between the Plaintiffs and Bechtel it acts as a waiver of any consequential damages against the Defendant, who is the subcontractor. Bechtel, as contractor and the Defendant, as subcontractor, subsequently incorporated by reference the last sentence of paragraph 7.2 ("OWNER'S waiver of certain rights against the Contractor as set forth in this Section 7.2 shall also constitute a waiver of such rights as against Subcontractors") in paragraph four of the amendment to the subcontract as amended subsequent to the date of the prime contract. Therefore, the Defendant wisely incorporated by reference the waiver of consequential damages applicable to the prime contract into the subcontract to benefit itself as a subcontractor.

The parties have never brought before the Court a dispute as to the validity of the contracts in question, only their applicability to the blower blade change-out. *See Capricorn Power Company, Inc., et al. v. Siemens–Westinghouse Power Corporation*, C.A. No. 01–39J, slip op. at 26 (W.D.Pa. Jan. 9, 2004). Therefore, while we agree with the Defendant that the waiver of consequential damages is valid and binding between the Defendant and the Plaintiffs, it is dependant upon the finding of a jury as to whether such provision was applicable to the blower blade change-out.

Next we must evaluate the applicability of paragraphs 22.1 and 22.2 of the subcontract. The plain language of these paragraphs is unambiguous and straightforward. The Defendant has limited its liability against Bechtel to the "Total Purchase Order Price." However, unlike the waiver of consequential damages which was incorporated into the subcontract between Bechtel and the Defendant, this limitation of liability was not sought to be incorporated into the prime contract between the Plaintiffs and Bechtel. Such an incorporation would have foreclosed any argument that the Plaintiffs did not limit their possible recovery to the total purchase order price. We agree with the Defendant that the replacement of the blades with the re-designed blades would

have been included within the "or" language of paragraph 22.1 as such language is clear that the replacement of any equipment need not occur in the performance of the subcontract. The Court also agrees with the Defendant that the "or" language would apply no matter what type of claim is made by a party, tort, contract, strict liability, as per the provisions of paragraph 22.2.

However, the last leg of this analysis requires that the party attempting to prove such liability must have agreed to the provisions in paragraphs 22.1 and 22.2. Nowhere in the subcontract did the Plaintiffs agree to limit their recovery nor are these provisions incorporated by reference in the prime contract. Such an action would have been necessary in the Court's view for two reasons: 1) the subcontract postdates the prime contract, and an amendment of the prime contract would have been required as this provision was not previously a part of the prime contract; 2) the prime contract specifically stated in paragraph 3.8: *"No Privity with Subcontractors.* Owner shall not be deemed by virtue of this Contract to have any contractual obligation to or relationship with any Subcontractor." Absent an incorporation of paragraphs 22.1 and 22.2 into the Plaintiffs–Bechtel prime contract, those paragraphs cannot be read to be applicable to the Plaintiffs.

The Court understands the relationship between the work performed by the Defendant under a subcontract and the completed power plant bargained for under the prime contract between the Plaintiffs and Bechtel. However, the prime contract and the subcontract were two separate contracts, not two separate writings that were to be construed as two parts of one contract. It is true that with regard to the purchase and set-up of the power plant's generator, the two contracts concern the same subject matter. Nonetheless, the prime contract goes on to include additional details with regard to the construction of the entire plant and its completion. The nature of the prime contract is such that when executed the owner and contractor have established rights as between themselves and the contractor may or may not subcontract those portions of the work to be performed under the prime contract. Just as the definition cited above indicates, the subcontract is subordinate to another contract. The nature of these documents is not such that they are unrelated, but they are by necessity related as to the subject matter and deadlines, prices and approved methods of construction and contractors.

However, for the provisions of a contract to be applicable to the parties and provisions of a separate contract, an incorporation of the provisions of the one contract must made into the second contract. "Flow-through" provisions are common between construction prime contracts and subcontracts. Such provisions typically permit specific clauses originally set forth in the prime contract to flow into the subcontracts but not from subcontracts into prime contracts. The purpose of "flow-through" provisions is to place the subcontractor in the place of the prime contractor with respect to that portion of the prime contract responsibilities that were subcontracted to the subcontractor. *See Bernotas v. Super Fresh Food Markets, Inc.,* 816 A.2d 225 (Pa.Super.2002)(discussing the purpose of "flow-through" clauses in subcontracts).

For such a "flow-through" clause to have benefited the Defendant, it would have had to work its way "upstream" into the prime contract and be incorporated therein similar to the waiver of consequential damages originally placed in the prime contract. The Plaintiffs never bargained for a limitation of their potential recovery

against the Defendant in their prime contract similar to their waiver of consequential damages against all subcontractors. With the exception of the explicit waiver of consequential damages against subcontractors, the Plaintiff does not have any contractual obligations to the Defendant. Therefore, in the absence of an article within the prime contract incorporating paragraphs 22.1 and 22.2 of the subcontract, the limitations of remedy found in paragraph 22.1 are inapplicable to the Plaintiffs and the Plaintiffs, if successful at trial, can recover an amount in excess of the Total Purchase Order Price. Still, the Plaintiffs' recovery may be limited to the extent that it includes consequential damages should the jury find that the prime contract applies to the blower blade change-out. Such application of this contract is still a disputed fact for the jury's analysis and decision.

**AND NOW,** this 2nd day of July 2004, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED that summary judgment is GRANTED to the Defendant as to the counts of Negligence (Count III), Negligent Misrepresentation (Count IV) and Malfunction (Count VI) and those counts are DISMISSED based upon the Court's re-examination of the economic loss doctrine; IT IS FURTHER ORDERED that summary judgment is DENIED to the Defendant as to its request for dismissal of the Fraud count found in the Plaintiffs' Amended Complaint and said count remains to be decided at trial; IT IS FURTHER ORDERED the summary judgment is DENIED to the Defendant as to its arguments based upon 1) the theory that the generator failure originated with the failure of the end box diffuser and stiffeners, 2) gist of the action doctrine, as argued by the Defendant through its second motion for summary judgment, and 3) the insufficiency of the testimony of the Plaintiffs' experts based upon the argu-

ment that their opinions conflict so as to create speculation as to the cause of the generator failure; IT IS FURTHER ORDERED that summary judgment is GRANTED to the Defendant on the issue of the *validity* of the waiver of consequential damages clauses between the prime contract and the subcontract however, summary judgment is DENIED as to the *application* of the waiver of consequential damages clause as set forth in the prime contract and subcontract as the issue of application of the contracts to the blower blade change-out is an issue of fact for the jury; IT IS FURTHER ORDERED that summary judgment is DENIED as to the applicability of the limitation of remedy and liability clauses, found in the subcontract, in that such clauses are inapplicable to the Plaintiffs, as they never contracted to limit their remedies with these clauses.